Layman BYNUM, J. B. Johnson, E. A. Dillard, Irby Jackson, Leon C. Roe and Gwyn Crouse, Appellants,

v.

BAGGETT TRANSPORTATION COMPANY, Inc., Appellee.

No. 15744.

United States Court of Appeals Fifth Circuit.

Jan. 11, 1956.

---

Clifford J. Durr, D. N. Hamilton, Montgomery, Ala., for appellants.

James A. Simpson, Reid B. Barnes, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

BROWN, Circuit Judge.

Appellants, owner-lessors of motor trucks under an operating lease to appellee, Baggett Transportation Co., Inc., an interstate motor truck contract carrier,

sought an accounting of their percentage share of the "earned revenue" or "revenue" fixed in the lease operating contract.[1]

Obviously a proper action for accounting in both substance and procedure, involving hundreds of distinct shipments of countless commodities to and from numerous points, presenting thus the inevitable esoteric mysteries of application and interpretation of carrier tariffs, the court referred it all to a Master who heard extensive evidence and filed a detailed 115-page, analytical, well-organized report.[2]

The district court, on exceptions to the Master's report, sustained it in full, and, the testimony heard by the Master never having been transcribed and included as a part of the record, we must, in the very narrow review of a Master's Report, abide by his fact findings since there is no way to test them under the scrutiny of "clearly erroneous"[3] and we reject the assertion that absence of the hearing record be-

1. The lease covering specific motor trucks required lessor-owner to pay or bear all operating expenses and losses including cargo, and bound lessor not to carry cargo for others. Compensation to lessor, in addition to public liability—property damage insurance and payment of state mileage tax by lessee was fixed as follows:

"5. The Company agrees to pay the Owner for the use and operation of said vehicle(s) on whichever of the following basis is applicable, less deductions provided herein:

"(a) 15¢ per round trip miles travelled within the State of Alabama when using Owner's tractor and Company's trailer.

"(b) 18¢ per round trip miles travelled within the State of Alabama when using Owner's tractor and trailer.

"(c) 65% of *earned revenue* on operation in interstate shipments when using Owner's tractor and Company's trailer.

"(d) 70% of *earned revenue* on operation in interstate shipment when using Owner's tractor and trailer.

"(e) 65% of *earned revenue* when hauling general commodities moving on Government bill of lading in interstate shipments when using Owner's tractor and Company's trailer.

"(f) 70% of *earned revenue* when hauling general commodities moving on Government bill of lading in interstate shipment when using Owner's tractor and trailer.

"(g) 60% of *earned revenue* when hauling explosives moving on Government bill of lading using Owner's tractor and Company's trailer.

"(h) 65% of *revenue* when hauling explosives on Government bill of lading using Owner's tractor and trailer, upon return of the signed delivery receipts for loads hauled and driver's logs proper*ty* kept. Settlements shall be made weekly." (Emphasis supplied.)

2. 1725 separate shipments were involved, and 1073 for five plaintiffs were examined in detail, of which 691 were not in dispute, 97 were supported by incomplete evidence, the remaining 285 being tried on the issues discussed *infra*. Of these 285, payments for 160 were found to be correct, the plaintiffs [appellants] overpaid in 95 and underpaid in 30.

3. Fed.Rules Civ.Proc. rule 53(e) (2), 28 U. S.C.A.: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous * * *. Application to the court for action upon the report and upon objections thereto shall be by motion * * *. The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

The district court does not have the right to reconsider, weigh and evaluate evidence to arrive at its own independent conclusions, but must accept those of the Master unless clearly erroneous. Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 207 F.2d 912, 920; In re Connecticut Co., 2 Cir., 107 F.2d 734, 735; First National Bank & Trust Co. of Racine v. Village of Skokie, 7 Cir., 190 F.2d 791, 796, certiorari denied 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680; Anderson v. Mount Clemens Pottery Co., 328 U.S. 680, 689, 693, 694, 66 S.Ct. 1187, 90 L.Ed. 1515, 1524, 1526; Krinsley v. United Artists, 7 Cir., 225 F.2d 579, 582; Moore's Federal Practice, Vol. 5, § 53.12 [4] pp. 2982, 2983.

The concept here is the same as "clearly erroneous" under FRCP 52(a): Moore's Federal Practice, Vol. 5, § 53.12 [4], pp. 2982, 2983; United States v. Village of Highland Falls, 2 Cir., 154 F.2d 224, 227. The findings, when they reach us, have, therefore, a double insulation.

fore the district court was a refusal by the Master to comply with the Rule [4] or an abuse of the court's discretion in not requiring it.[5]

██ Our narrow inquiry is, therefore, to determine whether, as held [6] by the district court, the Master's conclusions find adequate support and reason on the face of his report.[7]

The controversy, a factual one, in the setting of the transportation business over the lawfulness of certain transportation charges and the inclusion of certain items in others, centered finally on five points: The lawfulness of (a) using Section 22 Quotations; (b) handling separate movements at lower rates under TS [tied shipments] or similar basis; and the inclusion of (c) dunnage charges, (d) 6% surcharge, and (e) stop-over charges.

The points were significant as rates charged shippers under (a), (b) if unlawful, and items (c), (d), (e) if not included in the accounting though collected from shippers, produced less revenue on which appellants' percentage would apply.

The (a), (b) category was of the greatest importance in volume of shipments and net dollars and, for our purposes, the operation was the same. These involved shipments for agencies of the United States Government, principally Army and Navy, under rates which were substantially less than the published minimum Contract rates on file with the Interstate Commerce Commission, 49 U.S.C.A. § 318. Shipments [8] made under TS numbers were billed at actual weights rather than minimum weights under the tariffs, the Section 22 Quotations [9] were preferential rates spe-

4. FRCP 53(e) (1): "The master shall prepare a report * * *. He shall file the report with the clerk of the court and in an action to be tried without a jury, *unless otherwise directed* by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits * * *.". (Emphasis supplied.)

5. Neither party having procured a transcript from the reporter prior to the filing of the Master's report, the district court declined appellants' motion then made to compel filing unless appellants posted $3,000.00 security for ultimate payment of the reporter's charges. Appellants objected that this was a burden beyond their financial resources as working men, but they made no effort to qualify for relief under a pauper's oath, 28 U.S.C. § 1915(b) or tender for settlement and approval by the Master and the district court for its or our use some reasonably suitable substitute record, e. g., FRCP 75(N), (C), (M). There is no showing that the stenographer was an official, appointed court reporter from whom the judge could have obtained a copy of the transcript without payment, 28 U.S.C. § 753. This action by the court satisfied "unless otherwise directed" in Rule 53(e) (1), footnote 4, *supra.*

6. The Master found Baggett indebted on classes of items to appellants, and appellants overpaid (hence indebted to Baggett) on others with a net balance in Baggett's favor for which a judgment

finding was made. The district court, accepting both subsidiary conclusions, nevertheless vacated Baggett's judgment against appellants on the ground that Baggett, under obligation to keep proper records and concurrently account to driver-owners, could not equitably recoup overpayments made through its own errors. Baggett acquiesced in this. The overpayments were, however, allowed as full credit against amounts found due appellants. Otherwise, the report was confirmed.

7. Errors claimed concerning admissibility of certain oral testimony before, and its evaluation by, the Master fall, of course, for want of an adequate record for review, footnote 5, *supra.*

8. Under Freight Classification Rule 13, § 3, a volume (truck load) rate, lower than the minimum, is permissible for a "shipment" shipped from one plant, in one day by one shipper to one consignee under one bill of lading. Here, however, the Army, for a large consolidated movement required the carrier to treat it as one shipment though actually moved on numerous trucks over a considerable period of time at varying weights less than minimums. The carrier would, of course, obtain the advantage of the total volume traffic, but an owner-driver for such a single load would receive much less revenue.

9. "Section 22 Quotations", a term of art, takes its name from 49 U.S.C.A. § 22 allowing carriers to make special, and

cifically agreed to with the Government, and in other cases shipments moved for the Army under rates specified in filed minimum schedules with the Navy.

The appellants contended that under the terms of the tariff classification separate, distinct shipments could not be tied together as one and to bill the shipper a lower rate in this way, even though it be the Government, was to violate the strict standard of the law requiring the filing and literal adherence to specified minimum rates and charges, 49 U.S.C.A. § 318. The Section 22 Quotations were, they contended, even worse, since Baggett as a Contract, not common, Motor Carrier, was ineligible to make Section 22 Quotations.[10]

█ They had to concede, and the findings clearly affirm, however, that these agencies of the United States Government had demanded (and which they could have obtained by the simple execution of contracts or the filing of

amended minimum schedules) these favorable terms in the handling of these large, Korean defense shipments, and the General Accounting Office[11] had already obtained or demanded refunds and asserted credits against charges billed by Baggett in excess of these lower rates in sufficient typical shipments to reflect a settled pattern of administrative treatment in auditing all future items.

Their claim, therefore, was essentially that the truck lease-operating contract fixing compensation in terms of a percentage of transportation revenues gave them a special status to police all shipments and require absolute and literal compliance with effective published minimums. The consequence of this would be to force on Baggett the Hobson's choice of acquiescing, at its expense, in the construction put on complex tariff problems by owner-drivers claiming added compensation or commencing and maintaining slow, cumbersome, expensive and discouraging litigation[12] prob-

preferential, rate agreements with the United States Government: "Nothing in this chapter shall prevent the carriage * * * or handling of property free or at reduced rates for the United States, State, or municipal governments * * * or the transportation of persons for the United States Government free or at reduced rates * * *."

10. The National Transportation Act, Part II, carefully distinguishes between common and contract motor carriers. 49 U.S.C.A. § 317 permitting Section 22 Quotations refers to common carriers only: § 317(b) "No common carrier by motor vehicle shall charge or demand or collect or receive a greater or less or different compensation for transportation * * * than the rates, fares, and charges specified in the tariffs in effect at the time * * * *provided*, That the provisions of sections * * * and 22 of this title shall apply to *common carriers* by motor vehicles subject to this chapter." [Emphasis supplied.] The Interstate Commerce Commission so held in Baggett's request for an Advisory Ruling covering similar Governmental shipments, Baggett Transportation Company—Petition for Exemption —transportation for the U. S. Government, MC-C-1419, (Division 2) May 20, 1953, * * * ICC * * *; the ef-

fective date was postponed to September 1, 1953, a date subsequent to the shipments involved here. The Commission recognized, however, that in requiring the filing and publication of minimum rates, Baggett, as a contract carrier, could make whatever contracts it wished with Governmental agencies and, on proper showing, might even be relieved under the proviso of Section 318 from this.

11. Appellants objected to the admissibility of claims (GAO Form 1003) and similar correspondence from the Comptroller General's office, and the adoption of them by the Master in determining the rate ultimately to be collected by Baggett on a given shipment. Obviously they were admissible to prove the *fact* of the tenacious controversion of the original billing and the *fact* that in all likelihood only litigation—if successful— would change the governmental view.

12. Questions would inevitably arise: who, carrier or driver-owners, is to finance the litigation? Or finance continued operations as the alleged overpayments were asserted as credits by the shipping agencies against current invoices under fear of accounts being disallowed by the General Accounting Office, 31 U.S.C.A. §§ 65 to 134, or by the General Account-

ably in the distant Court of Claims against one of its best customers.

 We think both Master and district court were right in rejecting any such course for a carrier. Disposition between owner-lessor and carrier-lessee is not to be tested by that which the carrier might ultimately force a shipper to pay. The test is one of good faith, business judgment and honest practice in billing shippers for the rate which the carrier considers to be properly due and, where genuine controversy arises on the proper charge, in the resolution of such differences by honorable, practicable compromise and adjustment or litigation as the circumstances indicate to be a wise and prudent course. This is not to open up the evils of preferential favoritism between carrier and special customers which tariff legislation, 49 U.S.C.A. §§ 318, 322(a), forbids for the carrier remains amenable to all such sanctions, civil and criminal. And, between it and its owner-drivers, what it finally retains it must share. In this way, the carrier will comply with its public obligation and satisfy its private duties as well.

 As the report reflects prudent, vigorous action by Baggett in asserting its position with agencies of the United States Government with no indication that it has gratuitously relinquished any right to higher rates which would have increased both its and the owner-lessor's revenues, appellants are, therefore, entitled to share only in the revenues finally collected and retained in that process.

On (e) stopover charges, appellants claimed that this added charge of $6.06 payable by the shipper to permit partial delivery en route was a part of earned revenues. The Master considered that it was not for transportation and dis-

allowed it. Since this involved necessarily the nature of this charge and its status in the transportation world, we have, with no record before us, no basis for redetermination of it.

 On the remaining items (c) and (d) the Master found that under the applicable tariff rules dunnage charges should not have been billed the shippers and the *ex parte* 6% surcharge increase in tariff rates, granted by the Interstate Commerce Commission to common carriers only, should not have been billed or collected by Baggett, a Contract carrier. Accordingly he ruled that, it being plain that Baggett could not retain these items where charged and collected, appellants were not entitled to a percentage of them and where their percentage had erroneously been credited to appellants, they should refund the amounts to Baggett. We agree in principle with this.

The result is that we accept the rulings on all of the points (a), (b), (c), (d), (e) and decline to undertake ourselves or order the district court to reexamine them. We think, however, that since this is an equitable action for accounting, we must be certain that appellants do receive their percentage share in any portion of the four items (a), (b), (c), (d) and all related accounting items which are finally retained by Baggett. It is asserted by Baggett that with respect to (a), (b) and similar Tariff, Schedule and Quotation application problems, it either has or will reimburse the United States Government or reduce the invoices not yet paid to those amounts which the Master has found to be due by the shipper for the transportation, and that similar reimbursements or reductions have or will be made on items (c), (d). These accounting adjustments with the Government may well take years to complete. Consequently, we remand

---

ing Office itself under 49 U.S.C.A. § 66, "* * * the right is reserved * * * to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier"? Or finance extensive hearings

before the Interstate Commerce Commission to determine the "just and reasonable" rate which ought to have been charged, United States v. Garner, D.C. E.D.N.C., 134 F.Supp. 16?

the case to the district court for appropriate continued supervision to make certain that appellants do receive their share in all of such amounts ultimately collected and actually retained. Baggett insists that when completed, it will have received and retained only that which the Master fixed as the basis for the percentage share. If it does, it should be discharged; but what it retains, if more than this, it must share.

While, subject only to the post-remand supervision provided for herein, we approve all that the Master found, we are of the opinion that the district court erred in affirming, without more, that portion of the report by which a claim for a total of 97 shipments "supported by incomplete evidence" was, in effect, dismissed.

It is undisputed and both Master and court found, that there were many errors, mistakes, and discrepancies in the accounts [13] and records kept by Baggett.

This being so, the lease contract obligations and the existence of patent inaccuracies made it a proper case for a full accounting. But in the face of this necessity, the action of Master and court indicates that each felt it was on the appellants to bring forth all of the details as to the amounts charged by Baggett to shippers, that shown as the basis for owner-lessor's percentage, and also facts indicating that such amounts were incorrect and what the correct amounts would be.

We think this was wrong. We decline to put it in terms of burden of proof, although the problem is akin to it. We prefer to rest our view on broad equitable principles that, having the obligation to account, one whose accounts are demonstrated to be defective and inadequate must shoulder a substantial obligation diligently to make a correct account.[14]

To account is to do just that. The one obliged to account does not fulfill his duty by supplying only that which the beneficiary requests, that which is conveniently accessible, or remaining silent

---

13. For example, in numerous cases the amount billed the Government was much larger than the transportation revenue shown on the owner-lessor's weekly settlement sheet. Baggett justified this primarily on the ground that the amount shown on the settlement sheets would ultimately be the amount the Government would recognize as due. The Master, of course, in the 285 shipments ruled precisely on each of such matters.

The Master stated: "The conclusion reached from all of the evidence in this case is that there were many mistakes, errors and differences of opinion as to rates, but that there was no evidence of fraud or misrepresentation on the part of defendant toward the plaintiffs."

The district court stated that appellants were, "Stirred to action by discovery of a pattern of discrepancies uniformly in favor of defendant, between the revenue reported by defendant on each plaintiff's statements of earnings and the charges shown on bills of lading and other records supporting vouchers submitted to and paid by the Government * * *."

14. 1 C.J.S., Accounting, § 39, pp. 678, 679; Wootton Land & Fuel Co. v. Ownbey,

8 Cir., 265 F. 91, 99, "When the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the plaintiff, because of money or property intrusted to him, the burden is upon him to show that he has performed his trust and the manner of its performance. He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed his duty. 1 Mechem on Agency (2d Ed.) § 1344; 1 Corp.Jur. 643; 3 Gr. on Ev. § 253; 1 Story, Eq.Jur. (14th Ed.) § 625; Marvin v. Brooks, 94 N.Y. 71, 75; Little v. Phipps, 208 Mass. 331, 335, 94 N.E. 260, 34 L.R.A.,N.S., 1046. He must therefore prove any allowances or credits that he may claim to have made on behalf of his principal. In making proof of credits claimed by him, he should present an itemized statement, showing the details of expenditures, with the vouchers, receipts, and memoranda supporting his claim."

Cafritz v. Corporation Audit Co., D.C. D.C., 60 F.Supp. 627, 631, "It is well established that when the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the

in the face of the beneficiary's inevitable difficulty in trying to construct or reconstruct accounts which ought to have been kept and available.

■ Baggett was obliged fully to account. It did not do so on these 97 shipments. We therefore reverse and remand that part of the judgment for further proceedings by the district court as will assure such an accounting.

The case is therefore remanded for the further and not inconsistent proceedings provided for herein.

Remanded.

plaintiff, because of money or property intrusted to him, the burden is upon him to show that he has performed his trust and the manner of its performance. He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed his duty. Wootton Land & Fuel Co. v. Ownbey, 8 Cir., 265 F. 91. The burden of proof is on the accountant after he has admitted the relation and the receipt of a certain sum, to prove that he had disposed properly of the amount for which he is accountable, and to show what that amount is. Pappathanos v. Coakley, 263 Mass. 401, 161 N.E. 804."