258 F.2d 168
 Mrs. Brynia BIRD and Mrs. Ethel Gold, Appellants,
v.
Lawrence STEIN and Sam Stein, Individually as Co-Partners of
the Partnership Known as Stein Brothers, and L. B.
Stein, Appellees.
 No. 16826.
 United States Court of Appeals Fifth Circuit.
 June 30, 1958, Rehearing Denied Sept. 9, 1958.
 
 Frank E. Everett, Jr., C. Delbert Hosemann, Brunini, Everett, Grantham & Quin, Vicksburg, Miss., for appellants.
 W. C. Keady, Roy D. Campbell, Jr., Edward J. Bogen, Farish, Keady & Campbell, Greenville, Miss., for appellee.
 Before RIVES, BROWN and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 This is a suit for an accounting by two sisters against their brother as trustee. The sisters, Mrs. Brynia Stein Bird and Mrs. Ethel Stein Gold, describe their brother, Lawrence Stein, as 'a modern Esau who in sheep's clothing * * * deprived them of their rightful inheritance'. Lawrence accuses his sisters of wanting to 'crush out (his) economic life in order that they may plunder the product of a lifetime's toil'.
 
 
 2
 The case is before us for the second time. The sisters, successful on the first appeal but appellants again, charge the trial judge with 'again gulping hook, line and sinker the wriggling, slippery, elusive and double-tongued oral testimony of Lawrence Stein' and 'throwing the same white cloak of immunity over the black testimony of Lawrence Stein * * * this Court of Appeals ripped away'. This, say the complainants, is 'the first instance of a district court reversing the decision of a Circuit Court of Appeals.' Appellants put this Court on notice, in the first sentence of their brief, that 'the whole philosophy and jurisprudence of fiduciary accounting are at stake in this case'.
 
 
 3
 The briefs are long, exhibits numerous, the Master's Report detailed, the record hefty. We have gone through all of this painstakingly, and the twenty-seventh Chapter of Genesis besides.[1] We reach these conclusions. Fiduciary accounting is not imperiled. The district court has not reversed this Court. Instead, with the patience of Job, the able, conscientious trial judge complied with the mandate of this Court as fully as the involved facts of the case and inter-Stein hyperbolic jeremiad permitted. The case turns on questions of fact. We hold that the findings of the trial judge are not clearly erroneous.
 
 I.
 
 4
 V. A. Stein and his wife bought Little Hope Plantation in Washington County, Mississippi, in 1904. The tract consist of 378 acres of which 280 were open cultivatable acres in 1935. The Steins raised eight children[2] in comfortable circumstances. Several helped on the farm and in the store, but Lawrence worked more closely with his father than the other children and was the favored son. V. A. Stein died August 27, 1933. Under his will he left a life estate in his property to his wife, Sara, with the remainder in trust for his seven surviving children and two grandchildren. Lawrence and Ethel were named co-trustees. The trustees were instructed to hold, operate, or rent the property for ten years after Sara's death, no distribution to be made for three years. The trust came into existence when Sara died, March 10, 1935. According to Lawrence, he rented Little Hope from his mother for $3,000 a year; after his mother's death, he stated to his brothers and sisters, assembled in a family meeting, that he would not serve as trustee but would continue to rent and operate Little Hope as he had done before his mother died. Two sisters and a brother corroborated him; the complainants deny that there was any rental agreement. Lawrence never married. His sister, Mrs. Ethel Gold, after being widowed, resided with him for twenty-two years. It was a close, happy family until 1949, when Lawrence refused to give Mrs. Gold's son sufficient money to establish himself in business. May 19, 1950 Mrs. Gold, a cotrustee, and Mrs. Brynia Bird, another sister, filed suit against Lawrence.[3]
 
 
 5
 The complaint alleges that Lawrence took over Little Hope Plantation and other trust property, managed all of it for his own benefit, commingled trust property with his property, and has never made any accounting. Lawrence defended on the ground that there was no valid trust, since at the time of his death his father had only some personal property (willed to Lawrence) and an interest in Little Hope; that Little Hope was acquired under a deed creating an estate by entirety and therefore this property passed to Mrs. Stein on V. A. Stein's death. Lawrence defended also on the ground that he had refused to act as trustee. The district court agreed with Lawrence and dismissed the complaint. 1953, 102 F.Supp. 399.
 
 
 6
 On appeal, this Court reversed and remanded the case 'with directions that a full accounting be made, discovery had, a division of the estate effected as the interests of the parties may appear, and judgment rendered against the appellee Lawrence Stein for any amount that may be due to the beneficiaries of the trust'. 5 Cir., 1953, 204 F.2d 122, 124.[4] A rehearing was refused. 5 Cir., 1953, 205 F.2d 512.[5]
 
 
 7
 In compliance with this decision, Lawrence filed an original account and, to meet various objections of the appellants, three supplementary accounts. The accounts were prepared by his auditors on the basis that in 1935 Little Hope Plantation was the only property in the trust. Appellants requested appointment of a receiver, raising the new contention that the V. A. Stein trust included not only Little Hope Plantation but the Johnson Place, the 'Stein Brothers' cotton gin, the 'Stein Brothers' store, and all other assets which Lawrence claimed were his individual property or assets of Stein Brothers. The trial court found that in 1935 the trust consisted solely of Little Hope.
 
 
 8
 The district judge, at the appellants' request, appointed a master and referred the trustee's account to him with instructions designed to carry out the mandate of this Court. The master audited the account and found that the trust was entitled to 'a part of the grand total net income based upon the contribution of the said trust (Little Hope) in the production of the overall net income' of Lawrence Stein and Stein Brothers. The court below adopted the master's report.
 
 
 9
 Appellants attack: (1) the court's determination of the property ownership and (2) the court's adoption of the master's report. They contend that in 1935 the trust included the Johnson Place, store, gin and other assets Lawrence claims; that because of the commingling of trust property with Lawrence's property, all of Lawrence's property falls in the trust.
 
 II.
 
 10
 The decisive question in the case is, what property constituted the trust estate in 1935? The storm center of this controversy is the ownership of the Johnson Place consisting of 794 acres, of which 502 acres were open cultivatable acres in 1935.
 
 
 11
 Lawrence went to work for his father in 1918 at $150 a month. He assisted in the store, kept records, aided in the farming, gradually became more important to his father. He testified that his father kept his money for him, except for a little spending money amounting to about $30 or $40 a month. In 1926 he became Postmaster at Chatham. From the first, he was able, industrious, thrifty. While working for his father, he engaged in side ventures, trading mules, livestock, scrap iron, anything he could make a dollar out of. He began to make enough dollars to be of help to his father from time to time-- shifting funds from his account to his father's account.[6]
 
 
 12
 According to Lawrence, he had been interested for some time in buying the Johnson Place. To obtain sufficient funds for the down payment on the purchase price, he asked his father to pay the money withheld over the years. V. A. Stein told him to 'go ahead with your transaction and I will make the money available'. Both went to the First National Bank at Greenville, owner of the property, and spoke with W. H. Negus, president of the bank. After several meetings, they agreed on a price of $31,500, less a first mortgage indebtedness of $16,500 owed the Federal Land Bank to be assumed by Lawrence. The deal was closed October 22, 1929, when $5,000 was paid to bind the transaction. Mr. Negus on behalf of the bank executed a deed to Lawrence on the same day, but held it in escrow until December 2, 1929, when the remainder of the cash payment was paid. By resolution dated November 12, 1929 the Board of Directors of the Bank approved the sale to Lawrence Stein. The district court found that Lawrence was 'without doubt the real purchaser and was thus understood to be so by the bank'.
 
 
 13
 There is evidence that V. A. Stein recognized that Lawrence had an interest in V. A.'s principal savings, a certificate of deposit for $10,000 at the Citizens Bank. V. A. Stein cashed this certificate and made a $10,000 first mortgage loan. The mortgage notes were left for collection at the Old Citizens Bank, under a memorandum written by the Bank's President but signed by V. A. Stein: 'On Wynn & Hafter $10,000,-- a/c V. A. Stein and Lawrence Stein, 1/2 and 1/2, 9/11/28'. This is an independent record that V. A. had at least $5,000 which he regarded as Lawrence's. These mortgage notes had a bearing on the down payment for the Johnson Place. March 22, 1930 V. A. Stein sold the notes to his daughter, Mrs. Gold. The procees were placed the same day in the V. A. Stein account at the bank and used to retire a $7,500 demand note V. A. Stein had made at his bank December 2, 1929. The proceeds of this demand note had been used by Lawrence that same day to complete the down payment on the Johnson Place.
 
 
 14
 There is a great deal of evidence corroborating Lawrence. Two sisters, Mrs. Cornblatt and Mrs. Schwartz, and Sam testified for Lawrence.[7] Neil Magruder, an accountant who set up books for Stein Brothers in 1941, testified that he set up accounts for each heir based on a one-eighth interest 'in the home place' only. On the first trial Mrs. Gold testified that Little Hope was the only property her father had.[8] She retracted this statement on the second trial, but did admit that the family referred to the Johnson Place land as Lawrence's. A number of witnesses supported Lawrence's position: Mrs. Goodman, a relative;[9] John McMillan, first manager of the Stein Brothers gin;[10] Andre Worthington, raised with the Steins as children together; John J. Hall, a tobacco salesman; Leroy Shanks and Lloyd O. Patton,[11] long-time neighbors.
 
 
 15
 V. A. Stein's original will makes no mention of the Johnson Place as part of V. A. Stein's estate. The will left his 'real, personal and mixed property' in trust, authorized the trustees to 'operate said lands for farming purposes', and 'further direct(ed) that my trustees maintain the home located on said property'. The home was on Little Hope. Very significantly, the will, dated November 30, 1930, about a year after the purchase of the Johnson, Place, provides that 'any and all amounts heretofore given to my children or either of them directly or indirectly by gifts or by loan shall be considered as outright gifts, and shall not be charged in any way against their interest in my estate'.
 
 
 16
 V. A. Stein executed a codicil December 30, 1930, giving to Lawrence 'in fee, all of the stock of merchandise now located in the Chathan store, (the Johnson Place was at Chatham) togehter with all of the livestock and farming implements that may be located on Chatham plantation at the time of my death'. This indicates rather plainly that the testamentary trust did not include the Johnson Place. If the trust had included the Johnson Place and the store, it is hardly likely that V. A. Stein would have excluded from the trust the merchandise in the store, and the livestock and farming implements necessary for farming the tract. If, however, the Johnson Place and store belonged to Lawrence individually, it was logical and natural for V. A. to give Lawrence merchandise in his store and livestock and farming implements transferred from Little Hope to the Johnson Place.
 
 
 17
 Sol Stein entered in partnership with Lawrence in 1930 after the purchase of Johnson Place. The stock of merchandise in V. A. Stein's store was transferred to Stein Brothers' larger and better located store. The store bore the name 'Stein Brothers' and it was known by this name in the Chatham community. Lawrence and Sol lived in quarters connected with the store. After several months the brothers built a cotton gin on the Johnson Place. They financed it, obligated themselves for gin machinery amounting to more than $16,000, gave a mortgage to Mississippi Cottonseed Company for cottonseed produced on the Johnson Place, and included the gin under the Federal Land Bank mortgage. The two brothers bought tools, equipment, livestock, seed, to carry on the farming operation. V. A. Stein was not obligated on any of the relatively heavy financing undertaken by these young men. The cotton gin, like the store, carried a sign and was known to the community as the 'Stein Brothers' gin. The crops and all of the operations of the gin were handled under the name of Lawrence Stein or Stein Brothers.
 
 
 18
 In 1930 Stein Brothers borrowed $12,000 from the First National Bank. The proceeds were deposited to the account of Stein Brothers. The signature for this account, and for accounts at the Greenville Bank & Trust Company, authorized only Lawrence to withdraw funds.
 
 
 19
 Fire insurance on the Johnson Place was carried in Lawrence's name from 1930 Until 1948. In that year the insurance on Little Hope was carried with the insurance on the Johnson Place, but the policy separated the two tracts; the Johnson tract was described as 'owned by Lawrence, the Little Hope tract was described as individually' owned by 'Lawrence individually and the Estate of V. A. Stein'.
 
 
 20
 In 1931, as owner of the Johnson Place, Lawrence resisted an effort of the Leota Drainage District to assess for drainage taxes a part of the Johnson Place; V. A. Stein joined as owner of Little Hope. In 1932 Lawrence was awarded a judgment of $8,000, when the Mississippi Levee Board condemned several hundred acres of the Johnson Place. In the same year Lawrence received from his vendor, the First National Bank, 27 acres somehow lost in the original transfer; the deed was to Lawrence. In 1933 Lawrence executed a deed to the Levee Board covering a small tract on the Johnson Place. In 1934, before the death of Mrs. Stein, and in 1943, Lawrence executed an oil and gas lease on the Johnson property. Lawrence Stein or Stein Brothers paid the annual installments of $1,300 to the Federal Land Bank, and always paid the taxes.
 
 
 21
 The evidence is not all one-sided. (1) When the First National Bank received payment checks for the Johnson Place a bank official noted on the ledger that the sale was to V. A. Stein. The same official, however, signed the deed to Lawrence Stein and was Secretary for the Board of Directors when the Board adopted its resolution approving the sale to Lawrence. (2) From 1930 to 1950 the property was usually assessed in the name of V. A. Stein. (3) V. A. Stein executed a ninety-nine year lease on a two-acre tract of the Johnson Place for a Presbyterian Mission Church. The description places the site in Section 14 (where Little Hope is situated), but then refers to its actual location on the Johnson Place. V. A. Stein had previously granted use of his old store building on Little Hope to be used for church services and it was so used until destroyed by fire. (4) Mrs. Gold, Mrs. Bird, and Mrs. Schlessinger testified that there was no agreement for Lawrence to rent Little Hope; that the Johnson Place, the store, the gin, all belonged to V. A. Stein; that all the properties were operated as one because they were considered as belonging to the family as a whole.
 
 
 22
 Sol and Lawrence remained in partnership, apparently with no friction, until Sol died in 1943. He left his entire estate to Lawrence. The will provided: 'I sincerely trust that my other brothers and sisters are not unmindful of the deep love and affection which I do now and always shall bear toward them as our ties of relationship and blood are close to me and my heart. However, it is my considered judgment that it will be to the best interest of our family for me to designate Lawrence my sole beneficiary. Lawrence and I have had the care of and the management of all the family's interests and after my demise I believe that it will not be well to restrict him in such management. I have unbounded confidence in his ability, integrity and fairness and I know that he will always deal justly with my other brothers and sisters.
 
 
 23
 'However, I wish it distinctly understood that this expression is not to be construed as any reservation, limitation or restriction on the unqualified and outright devise contained in article two because my brother, Lawrence is to have the right and power to do with and dispose of with whatever he takes under article two the same as his own estate.'
 
 
 24
 Appellants construe the will as proving that Sol considered everything a family enterprise and 'Stein Brothers' as the operating name of the entire family interests. But it may also be construed as the will of a man who felt free to dispose of his own property as he saw fit; hardly the will of a man holding title to property of another, with a last chance to declare the true ownership. In contradiction of his claim that he had exclusive ownership of the land at the Johnson Place, Lawrence as Executor of the estate and Sol Stein, reported that Sol owned a one-half interest in the Johnson tract.
 
 
 25
 Weighing all the contradictory and conflicting evidence, the trial judge was convinced that the trust estate consisted solely of Little Hope. (1) As to the Johnson Place, 'all of the important and serious acts of ownership were taken by Stein', individually or for Stein Brothers and not as trustee. (2) The Stein Brothers cotton gin and store were on Johnson Place, were built in 1930 and managed by Lawrence and Sol, and belonged to these two brothers. (3) The merchandise in the store and the livestock and farming implements on Johnson Place at the time of V. A. Stein's death were bequeathed to Lawrence individually. (4) The Jim Taylor tract of 40 acres belonged to Lawrence, a purchase made individually in May, 1933 upon foreclosure of a mortgage loan made in 1931. (5) There is no evidence that V. A. Stein left any cash or securities. Mrs. Gold, who resided with Lawrence for twenty-two years prior to 1949, kept Lawrence's bonds in her lock box, and enjoyed his confidence, did not know of any cash or securities left by her father, although she had always assumed that he owned securities. Her father had borrowed $8,000 from her that was still owing at the time of his death. (Lawrence paid this $8,000 in 1942.) V. A. Stein had been a successful small farmer, averaging about forty bales of cotton a year, and he had operated a small store, but he had never been a person of wealth and he had raised a a large family. For the last year of his life he had been bedridden, and for some years before his death he had done virtually nothing in the way of work.
 
 
 26
 We agree with the trial judge. We agree also there is no necessary inconsistency between his findings as to what constituted the trust estate in 1935 and our decision on the first appeal. In our earlier holding we decided that there was a valid express, testamentary trust; that Lawrence had acted as trustee, commingled funds, and should account to the beneficiaries. Our opinion on the first appeal does not mention the Johnson Place, cotton gin, store, or any property except Little Hope, and we did not purport to decide what property was held in trust.
 
 III.
 
 27
 The sisters do not deny that Lawrence had record title to the Johnson Place or that he acted sometimes as titular owner. They say that all the money from the Johnson Place, cotton gin, store, and Stein Brothers assets came directly or indirectly from V. A. Stein and that the beneficial interest in these properties and other properties acquired with the profits of the various enterprises was in V. A. Stein and the family as a group. There is no evidence whatever that V. A. and Lawrence entered into any agreement to this effect. Appellants therefore are forced to rely on the theory that a resulting trust was created by operation of law, based on their proof that V. A. Stein paid for the Johnson Place.
 
 
 28
 The doctrine of resulting trusts cuts both ways in this case.' A resulting trust arises presumptively where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest in the property. * * * Where property is purchased by one person and the property is transferred at his direction to another, it is inferred that the purchaser intended that the grantee should hold the property for the benefit of the purchaser.' 4 Scott on Trusts, Sec. 404.1, p. 2922. See Chichester v. Chichester, 209 Miss. 628, 48 So.2d 123; Bush v. Bush, 134 Miss. 523, 99 So. 151. The inference or presumption is to the contrary, however, where the title is taken in the name of a close relative. Thus, 'where a parent purchases property in the name of his child, a gift is presumed even though the child is an adult'. 4 Scott on Trusts, Sec. 442, p. 3035. See Wilson v. Beauchamp, 1870, 44 Miss. 556. Moreover 'If A is indebted to B and at B's request A pays the owner of land for a conveyance to B, thereby discharging A's debt to B, B takes the title to the property free of trust'. 4 Scott on Trusts, Sec. 446, p. 3050. 'Where a transfer of property is made to one person, and the purchase price is advanced by another in discharge of a debt to the transferee, no resulting trust arises, since the payor intends that the transferee should have the beneficial interest in the property. * * * Such an intention may be shown not only by oral declaration of the payor's intention but also by the circumstances under which the transfer is made.' Restatement of the Law, Trust, Sec. 441(d), p. 1350, De Bardeleben Coal Corp. v. Parker, 1932, 164 Miss. 728, 144 So. 474, 145 So. 341.
 
 
 29
 Lawrence was the favored son who worked more closely with his father and had shown more industry and initiative than his brothers and sisters. Even assuming that V. A. paid the entire purchase price, the presumption is that the property was a gift to Lawrence. V. A.'s will supports this inference. Further, on the finding that whatever amount V. A. paid on the purchase price was paid in settlement of the money owed Lawrence, the presumption is that Lawrence took the property for his own account, and not as holder of the title for the benefit of others. 'The fact that after the purchase the payor has exercised no dominion over the property but has permitted the grantee to deal with the property as his own is a circumstance tending to rebut the inference of a resulting trust.' 4 Scott on Trusts, Sec. 441, p. 3025.
 
 
 30
 These are inferences only and may be rebutted, but they impose on appellants the burden of establishing the trust. In an old case, Logan v. Johnson, 1894, 72 Miss. 185, 16 So. 231, 232, the Mississippi Supreme Court declared that this burden was heavier than in most cases: 'Where it is necessary to prove (by parol) the existence of a (resulting) trust, 'the evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of the payment by the beneficiary beyond a reasonable doubt."
 
 
 31
 In final analysis, the existence of a resulting trust depends upon the intention of the parties as inferred from all of the circumstances. This is a factual question the trial judge resolved against the appellants. Going beyond the appellants' failure to meet the burden of proof, the trial judge held affirmatively that the facts showed there was not a resulting trust. We agree. We certainly cannot say it was clearly erroneous for the Court not to find that appellants established a resulting trust.
 
 IV.
 
 32
 Appellants argue that since Lawrence, in breach of trust, commingled trust property with his own in one indistinguishable mass, all of lawrence's property should be treated as part of the trust.
 
 
 33
 The Restatement on Trusts, Section 202(h) states the law as follows: '* * * Where the trustee wrongfully mingles trust property with his individual property in one indistinguishable mass, the beneficiary is entitled at his option either to enforce a constructive trust on the mingled property in such proportion as the trust property so mingled bears to the whole of the mingled property, or to enforce an equitable lien upon it to secure his claim against the trustee for the value of the trust property so mingled. * * * Where the trustee exchanges the mingled mass for other property, the beneficiary is entitled at his option either to claim a proportionate share of the product, or to enforce an equitable lien upon it to secure his claim for reimbursement. Where the property is or becomes more valuable than the mingled mass with which it is acquired, the beneficiary is entitled to a proportionate share of the property, and thus to secure the profit which arises from the transaction. Where on the other hand, the property acquired is or becomes less valuable than the mingled mass with which it is acquired, the beneficiary can enforce an equitable lien upon the property as security for his claim against the trustee.' See also Restatement on Restitution, Section 214.
 
 
 34
 Federal Courts have followed these principles. Marcus v. Otis, 2 Cir., 1948, 169 F.2d 148; MacBryde v. Burnett, 4 Cir., 1942, 132 F.2d 898; and Elmer Company v. Kemp, 9 Cir., 1933, 67 F.2d 948. The trustee has a duty to keep the trust res separate, and if he fails to do so he has committed a breach of trust. Surgi v. First National Bank & Trust Co., 5 Cir., 1942, 125 F.2d 425. The trustee has a right to show what property was his and what property belongs to the trust. See Central National Bank v. Connecticut Mutual Life Ins. Co., 1881, 104 U.S. 54, 26 L.Ed. 693.
 
 
 35
 The Supreme Court of Mississippi has recognized that when a trustee has commingled trust property with his own property beneficiaries are not entitled to appropriate the trustee's property. They are entitled to an apportionment of the profits. In Fant v. Dunbar, 1893, 71 Miss. 576, 15 So. 30, 31, Dr. Fant, a guardian, received a sum of money for his wards which he later used to purchase real estate in his own name. It appeared that part of the purchase money came from the wards' funds and the other part belonged to Dr. Fant. One of the wards filed suit against the guardian to establish his rights in the real estate purchased with the commingled funds. The court held:
 
 
 36
 'On the evidence it is entirely certain what part of the purchaseprice of the lot described in the pleading and evidence was the money of his wards, and what part was the money of Dr. Fant, the guardian. Under these circumstances, his wards had the right, at their election, to charge their money, with interest, upon the lot, or to take an interest therein proportionate to the amount of their money that went into it, as compared to the purchaseprice. They have not the right to elect to take the entire interest in the property, for that would be to appropriate, not their own, but the property of the guardian. Before making their election, the wards are entitled to have accounts stated in both aspects, and, being thus advised, to elect that which is the more beneficial to them.'
 
 
 37
 The only distinction that can be drawn between Fant v. Dunbar and this case is that Dr. Fant misappropriated specific funds in a certain amount. That is not a distinction that touches the principles involved. Here, the master and the court determined the amount of the trust funds commingled and the amount of the mingled fund in order to work out a fair apportionment, as in Fant v. Dunbar.
 
 V.
 
 38
 The argument for a resulting trust rests on showing that the circumstances raise an inference that the person paying the purchase price of the property did not intend the title holder to take the beneficial interest. A constructive trust arises, however, regardless of intention, in order to prevent unjust enrichment. Intention is material, however, in determining whether there was a conscious wrongdoing.
 
 
 39
 When a trustee wrongfully mingles trust funds with his own funds, the beneficiary has an equitable lien on the mingled fund, or property acquired with the fund, to secure reimbursement. If a trustee is a conscious wrongdoer, the beneficiary is entitled to enforce a constructive trust upon the property but only to share proportionately in the value of the acquired property. Thus, the Restatement on Restitution, Sec. 210 provides, in part:
 
 
 40
 '210. Effect of Acquisition of Other Property with Mingled Funds.
 
 
 41
 '(1) Where a person wrongfully mingles money of another with money of his own and with the mingled fund acquires property, the other is entitled to an equitable lien upon the property to secure his claim for reimbursement.
 
 
 42
 '(2) If the wrongdoer knew that he was acting wrongfully, the other is entitled at his option to a share of the property in such proportion as his money bore to the whole amount of the fund.'
 
 
 43
 The Restatement on Restitution, Sec. 214, provides that these rules are applicable to non-fungible things as well as to money and fungible things. See also 4 Scott on Trusts, Sec. 517.2, p. 3304; 54 American Jurisprudence, Trusts, Sec. 256, p. 199; Marcus v. Otis, 2 Cir., 1948, 169 F.2d 148. 'It is well settled that, if trust funds are mingled with personal funds of a trustee, the whole is impressed with a trust until separation of the trust property can be made, and that the trust is entitled to a proportionate part of the profits realized by the trustee in dealings with the fund in which the trust funds are mingled. And it is not necessary in asserting the rights of the cestui que trust that the trust funds be specifically traced. It is sufficient that they have been used by the trustee to augment a fund upon which profits have been realized.' MacBryde v. Burnett, 4 Cir., 1942, 132 F.2d 898, 900.
 
 
 44
 The district court found that Lawrence 'honestly believed that he was renting the (Little Hope) property from the heirs'; that 'Lawrence was acting in good faith and (was) not a willful violator of the trust'; 'he did not realize that he was a trustee * * * but was under a misapprehension of the obligations'. There is evidence to sustain the trial judge's finding: the family meeting for the reading of Mrs. Stein's will, at which Lawrence declared that he would not act as trustee, but would continue to pay rent to operate Little Hope; the corroborating testimony of two sisters, Mrs. Cornblatt and Mrs. Schwartz, and the brother, Sam Stein; the fact that Mrs. Ethel Gold, co-trustee, who resided with Lawrence for many years, never acted as trustee nor showed that she thought that there was a functioning trust. The trial judge might have held, consistently with his findings of no conscious wrongdoing that the beneficiaries were entitled only to be made whole, and not to share in any profit made with the mingled fund. Instead the trial judge, leaning over bankwards to be fair toward the beneficiaries, instructed the master 'to award to the V. A. Stein trust a part of the grand total net income based upon the contribution to the said trust in the production of the overall net income (from all of Lawrence Stein's operations)'. Lawrence has made no issue as to whether the trust has only an equitable lien, and we make no issue of it-- except to point out that the trial judge went as far as we directed on the first appeal in an effort to avoid the trustees deriving any personal gain from the estate.
 
 VI.
 
 45
 At the request of appellants, the district court appointed a master, an experienced certified public accountant, to audit the trustee's account and to determine the just interest of the trust in all Stein properties. The report is exhaustive, complies with the Court's instructions, and is as detailed, fair, and informative as the circumstances permitted.[12] It was a difficult task.[13] Prior to 1940 the trustee kept no books whatever, except a check register. All his business transactions were evidenced by check stubs, cancelled checks, invoices, a ledger where he made memoranda. Lawrence made no effort to keep separate books for the trust; for fourteen years there was no dissension in the family and he was never asked to account as trustee. In 1941, Neil Magruder set up books for Stein Brothers, but even after that date there are some missing bank records and some missing Stein Brothers records, destroyed in 1945 not by Lawrence but by Magruder, after examination of the documents.
 
 
 46
 Taking annual operating (profit and loss) statements for each calendar year beginning March 10, 1935 and ending June 30, 1956 the master found that the gross income from all properties was $3,083,750.46 and the net income $715,408.35. By the net worth method, however, the master found an ending worth of $785,336.40, or $69,928.05 more than the operating statements showed. He added this difference of $69,928.05 as 'unidentified increase in net worth', added the market value increase on assets acquired since March 10, 1935, amounting to $35,184.50, and arrived at a figure of $820,520.90 for the total net gain on gross income of $3,083,750.46. This amounts to a profit of 26.6 per cent on the gross-- a tidy profit.
 
 
 47
 As of March 10, 1935, Little Hope was valued at $15,120 against a total value of all Stein properties of $78,480. On the basis therefore of the relative value of all productive properties, the trust is entitled to 19.27 per cent of the total net gain. Subtracting debts from the gross values, the trust was valued at $7,120 or 13.05 per cent on the basis of comparative net worth. The master then determined that 28 per cent would be a fair and reasonable proportion of the total net income from all sources to assign the trust. In reaching this conclusion the master observed that the figure was, in his opinion, 'slightly outside of all bounds of reason' but that he was actuated by his understanding that 'every effort should be put forth to see that the trustee is not allowed to profit on the V. A. Stein trust'. There is a serious question in our minds as to whether the master should have used 13.05 per cent or 19.27 per cent, since these percentages find definite support in the facts and computations. But the error, if any, favors appellants. On principle, in a case where a trustee has commingled funds and kept incomplete records (for whatever reason), we believe that it is proper to allow a reasonable margin of error in favor of the beneficiaries.
 
 
 48
 The master assigned 28 per cent of the total income of $820,520.90, or $229,745.85, as the trust net income from March 10, 1935 to June 30, 1955; and $172,381.48 as the trust income up to December 31, 1951. This division was made because February 27, 1952, the appellants (Mrs. Bird and Mrs. Gold) sold their one-eighth undivided interest and Dr. Wolfe and Mrs. Schlessinger their one-sixteenth each, or three-eighths to Sam Stein. The share of each appellant up to each December 31, 1951 amounts to $21,547.69. During this period Mrs. Gold withdrew $20,551.07, leaving a balance due of $996.62; Mrs. Bird withdrew $12,630.92, leaving a balance due of $8,916.77. The master then allowed each appellant 42.88 per cent profit on the balance due from January 1, 1952 through June 30, 1955. Accordingly, as of June 30, 1955 Mrs. Gold would be entitled to $1,423.97 and Mrs. Bird $12,740.38.
 
 
 49
 Appellants object strongly to the master's use of the 'net worth theory', on the grounds that it is exclusively a tax fraud procedure and that the opening net worth was not established. Not all net worth cases are criminal prosecutions; many are civil cases. But it the net worth method is sufficient definite to provide the basis for depriving a man of his liberty, it seems to us that it is sufficient definite to have probative value in a civil case. The net worth method does not purport to be a method of accounting; it is simply a means of proving income when records are inadequate. It may not be used as a substitute for the accounting a trustee is under the duty to render. But it seems reasonable to us that the net worth method be used, as in this case, as a check on the accuracy of an account the trustee has filed. Lawrence Stein filed an account. The account goes back to 1935. The master was required to audit that account. Many of the records were stale, missing, or inadequate. It was proper therefore to resort to the net worth method, not to dispense with the trustee's duty to account, but to adjust the account so that it would reflect more accurately the true income. Net worth is a method usually used to the disadvantage of an accused person or party defendant. It was used to Lawrence Stein's disadvantage in this case.
 
 
 50
 The master stated in his report that 'doubtful questions have been decided adversely to the trustee'. Thus, the master believed that the opening net worth of Stein Brothers was a 'minimum figure' so that 'the effect in this report is that the overall net income is overstated'; depreciation of $9,747.40 on the Johnson Place buildings, other than the gin and store, was disallowed; Lawrence Stein's net post office commissions of $21,408.45 were added to the total income; the opening balance sheet for Stein Brothers assumes that there were no cash, no inventories, no accounts receivable; no allowance was made for Lawrence Stein's services in any capacity. The master adjusted the trustee's account upward by the net amount of $196,409.41.
 
 
 51
 As this Court said in Bynum v. Baggett Transportation Company, 5 Cir., 1956, 228 F.2d 566, when a master's findings of fact are adopted by the district court, 'the findings, when they reach us, have, therefore, a double insulation'. On the record we cannot say that those findings are clearly erroneous.
 
 VII.
 
 52
 There is a question as to whether the trust had any interest in the title to the Johnson Place, because of Lawrence Stein having used commingled funds to pay off the balance of the Federal Land Bank mortgage on the property. 'The beneficiary cannot trace his cash into the fee simple title to the realty because that was held by the trustee before the misappropriation and as a result of a deed to him * * *. Yet * * * it is just that the cestui should have a lien upon the realty to the extent that his funds have removed the mortgage encumbrance. Equity sanctions this result, and calls the process subrogating the cestui to the rights of the mortgage.' Bogert on Trust, Sec. 930, p. 122. See also Restatement on Restitution, Sec. 207, p. 838; 4 Scott on Trusts, Sec. 513, p. 3275; Windham v. Windham, 1953, 218 Miss. 547, 67 So.2d 467; Brabham v. Brabham, 1955, 226 Miss. 165, 84 So.2d 147.
 
 
 53
 We have recognized the beneficiaries' right not only to reimbursement for all trust funds commingled but to a proportionate share of the mingled fund, and we have protected the beneficiaries by impressing a constructive trust on all of the Stein properties, the Johnson Place included. The beneficiaries have no right to more. They are not entitled to share in the ownership of property Lawrence purchased six years before the trust was created.
 
 VIII.
 
 54
 There is a dispute over a $5,000 bond Mrs. Bird said was part of a $10,000 gift to her from Lawrence. The master and the trial judge found as a fact that the $5,000 was paid by Lawrence Stein to Mrs. Gold on an indebtedness of Mrs. Bird to Mrs. Gold, on the instructions of Mrs. Bird. The trial judge agreed that the master properly charged the $5,000 against Mrs. Bird's account. We too agree.
 
 IX.
 
 55
 Under the circumstances of this case, we believe that neither appellees nor appellants should be taxed with attorneys' fees or accountants' fees. In the exercise of our discretion under Rule 31 of this Court, 28 U.S.C., and 28 U.S.C. 1913, we direct that the appellees be taxed with the costs of appeal.
 
 The judgment is
 
 56
 Affirmed.
 
 
 
 [1]
 Contrary to the appellants' understanding of the biblical story, Esau was the favored son upon whom Isaac intended to bestow his blessing, and it was Jacob, not Esau, who came with subtilty to his father wearing the skin of young goats upon his hands and the smooth of his neck. 'The voice is Jocob's voice, but the hands are the hands of Esau'
 
 
 [2]
 The eight children: (1) Mrs. Bessie Stein Wolfe predeceased her parents, leaving two children, Dr. Sharkey Wolfe and Mrs. Fayette Wolfe Schlessinger; (2) Sol Stein died in 1943 and left his estate to Lawrence; (3) Sam Stein died sometime after 1950 and before 1955; (4) Mrs. Fannie Schwartz lives in Greenville, Mississippi; (5) Mrs. Ella Cornblatt lives in Eudora, Arkansas; (6) Mrs. Ethel Gold lives in Dyersburg, Tennessee; (7) Mrs. Trynia Bird lives in Kansas City, Missouri; (8) Lawrence lives in Chatham, Mississippi. Mrs. Bird and Mrs. Gold are the complainants; Mrs. Schlessinger supported them in this litigation. The other surviving sisters, Mrs. Cornblatt and Mrs. Schwartz, and Sam, the surviving brother when the case was first tried, supported Lawrence
 
 
 [3]
 The suit was against Lawrence Stein and Sam Stein individually and as copartners in Stein Brothers, and also against L. B. Stein, a nephew. L. B. Stein, son of Sam Stein, was brought in as defendant because in 1941 he purchased a plantation of 280 acres. The complainants contended that this 'grew out of the expansion and development of the original Stein estate' and was a part of the 'Stein lands' Lawrence managed. This contention was no pressed. The master found that the trust had no interest in the property
 
 
 [4]
 '* * * we are of the opinion that This contention was not pressed. the estate as provided under the will, but was commingling the funds of the estate with his own, and was not properly accounting to the beneficiaries of the trust. He at no time formally repudiated the trust, and is estopped to deny its validity. * * * Even though the estate which she (Mrs. Stein) held under the original deed prior to her husband's death was a joint tenancy, by electing to take under the will, and acquiescing in that part which bequeathed a portion of the property to her son Lawrence, she impliedly released any interest she might have had as a joint-tenant.' Bird v. Stein, 5 Cir., 1953, 204 F.2d 122, 124
 
 
 [5]
 '* * * A man may not step into and out of the role of trustee as his personal interest dictates; it is easier to step into the role than it is to step out of it; and the evidence in this case overwhelmingly shows that Lawrence Stein assumed the role of trustee under his father's will and acted in that capacity many times to his pecuniary advantage. * * *' Bird v. Stein, 5 Cir., 1953, 205 F.2d 512
 
 
 [6]
 The record indicates that as early as 1925 through 1928 Lawrence shifted amounts of $715.37, $1,014.35, $4,738.27, $3,706.20 and (probably) $8,000 to V. A. Stein's account
 
 
 [7]
 Mrs. Stein's will left her estate to Sam. Sam did not want to take under this will, since he felt that he should not have more than a one-eighth part of the property, and the will was never admitted to probate. Sam testified that at the family meeting held to discuss his mother's will, Lawrence refused to act as trustee. Lawrence 'got up and said: 'There ain't but one way I will work this property. * * * Papa didn't leave any money and Mamma didn't leave any money. I will rent it from you folks just like I did from Papa and Mama. * * *' They all agreed to rent it to Lawrence Stein'. Mrs. Cornblatt and Mrs. Schwartz testified to the same effect
 
 
 [8]
 On the first trial in March, 1951 Mrs. Gold testified:
 '* * * Q. Well, other than Little Hope, did he (V. A. Stein) own any real estate? A. Not that I know of.
 '* * * Q. Do you know anything about how that purchase was handled or anything about it? A. My father had cash money and he let Lawrence Stein have a certain amount of money to pay down on that place.' On the second trial she testified:
 'Q. Did you say that that day? A. Well, at that time I didn't know of any other land that my Father owned; that is true.
 'Q. You didn't know it at that time? A. No.
 'Q. Had never heard of it? A. In his name. I didn't know he had any other land in his name, as it is stated there.
 'Q. Those were correct answers? A. Yes sir.
 'Q. 'Other than this land there, did he own any real estate?' And you answered, 'No, not that I know of.' A. Yes sir.
 'Q. You were telling me the truth? A. Yes sir. * * *
 'A. If that book (Old Record) has it that way that was my statement then. But I do not remember my Father lending Lawrence money to go out and buy that place. * * *'
 
 
 [9]
 Mrs. Goodman testified that V. A. Stein had told her before the Johnson Place was bought: 'Lawrence had worked for him and with him and helped him in everything and he never did pay him any money,' other than spending money, and that he, V. A. Stein, 'owed him for the time he had worked for him.'
 
 
 [10]
 'A. Mr. Stein, he said yes, and said: 'It is a big place and I hope Lawrence does good with it.'
 '* * * Q. Do you recall whether or not after that, during Mr. Stein's lifetime, you ever heard him make any claim of ownership to the Johnson Place? A. I never heard him claim ownership. * * *'
 
 
 [11]
 Patton testified:
 'A. Mr. V. A. Stein. He said, 'My boy Lawrence has bought the Harry K. Johnson Place.'
 'Q. Do you recall that clearly? A. Yes sir.
 'Q. What was his attitude? A. He was very proud of it.
 'Q. You say he couldn't wait to tell you? A. He couldn't wait until I got in the door to tell me that.
 'Q. Was Lawrence present? A. No, he wasn't there at the time. * * *'
 
 
 [12]
 Commenting on the master's report, the district judge stated: '* * * The Master took a considerable amount of testimony, made personal inspections of the properties involved and was assisted from time to time by counsel for the respective litigants, and made a careful study of all the entire record; and I am of the opinion that his report is accurate and should be approved * * *.'
 
 
 [13]
 The master stated in his report: 'Reports prepared by the two firms of accountants contained information to the effect that they could not locate complete records for the entire period following March 10, 1935. It appears that very few records were available for the period prior to January 1, 1941, other than copies of income tax returns, reports prepared by the United States Treasury Department concerning taxable income of Stein Brothers and various memorandum books. The bookkeeper for Stein Brothers testified that many of the old bank statements and canceled checks had been destroyed from time to time when they thought that such records would not be needed further. On January 1, 1941, regular double-entry records were set up for Stein Brothers, but these records could not be relied upon to show all financial transactions as is clearly shown by the Trustee's first account filed with the Court. I refer to all of the adjustments appearing on the Profit and Loss Statement starting on page-- 43-- of said account. Although these double-entry records were in use for the partnership, there were many other business transactions carried only in the personal bank accounts of the individual partners. Very few, if any, of the bank statements of the individual partners were available for the period prior to 1947. In an effort to prepare accurate statements to show the result of business operations of the defendants, both firms of accountants found it necessary to obtain numerous statements of account from creditors, doctors and purchasers of farm products to supplement the information appearing on the records of the Defendants. * * * The approximate total number of bales of cotton ginned during the various years was known, and through a careful analysis of the cotton sales made by Stein Brothers, it was possible to know the number of bales ginned for the Stein Brothers' farms. * * * As a test check upon the accuracy of your records, we made a detailed examination of your claimed expenditures for labor for the years 1948 through 1953, your cotton picking charges for the years 1948 through 1953, and your payments to tenants for the years 1945 through 1952. The total payments for these costs as shown by your books was $361,615.58. The total which we were able to verify in details varied from this amount by only $452.18. * * *'