## McELROY, SECRETARY OF DEFENSE, et al. v. UNITED STATES ex rel. GUAGLIARDO.

No. 21.  Argued October 21–22, 1959.—Decided January 18, 1960.*

*Oscar H. Davis* argued the cause for petitioners in No. 21.  On the briefs were *Solicitor General Rankin, Assistant Attorney General White, Acting Assistant Attorney General Ryan, Harold H. Greene, William A. Kehoe, Jr., Peter S. Wondolowski, William M. Burch II* and *D. Robert Owen.*

*Frederick Bernays Wiener* argued the cause for petitioner in No. 37.  With him on the brief was *Arthur John Keeffe.*

*Michael A. Schuchat* argued the cause and filed a brief for respondent in No. 21.

---

*Together with No. 37, *Wilson* v. *Bohlender,* on certiorari to the United States Court of Appeals for the Tenth Circuit, argued October 22, 1959.

*Harold H. Greene* argued the cause for respondent in No. 37. With him on the briefs were *Solicitor General Rankin, Assistant Attorney General White, Acting Assistant Attorney General Ryan, William A. Kehoe, Jr., D. Robert Owen* and *John M. Raymond.*

MR. JUSTICE CLARK delivered the opinion of the Court.

These are companion cases to No. 22, *Kinsella* v. *Singleton, ante,* p. 234, and No. 58, *Grisham* v. *Hagan, ante,* p. 278, both decided today. All the cases involve the application of Article 2 (11)[1] of the Uniform Code of Military Justice. Here its application to noncapital offenses committed by civilian employees of the armed forces while stationed overseas is tested.

In No. 21 the respondent, a civilian employee of the Air Force performing the duties of an electrical lineman, was convicted by court-martial at the Nouasseur Air Depot near Casablanca, Morocco, of larceny and conspiracy to commit larceny from the supply house at the Depot. Before being transferred to the United States Disciplinary Barracks, New Cumberland, Pennsylvania, respondent filed a petition for a writ of habeas corpus in the District Court for the District of Columbia alleging that the military authorities had no jurisdiction to try him by court-martial. This petition was dismissed. 158 F. Supp. 171. The Court of Appeals reversed and ordered respondent discharged. It held that *Reid* v.

---

[1] Article 2. "The following persons are subject to this chapter:

. .

"(11) Subject to any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, persons serving with, employed by, or accompanying the armed forces outside the United States and outside the following: that part of Alaska east of longitude 172 degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands."

*Covert,* 354 U. S. 1 (1957), was binding as to all classes of persons included within the section and that each class was nonseverable. 104 U. S. App. D. C. 112, 259 F. 2d 927. We granted certiorari, 359 U. S. 904, in view of the conflict with *Grisham* v. *Taylor,* 261 F. 2d 204.

In No. 37, petitioner, a civilian auditor employed by the United States Army and stationed in Berlin, was convicted by a general court-martial on a plea of guilty to three acts of sodomy. While serving his five-year sentence, petitioner filed a petition for a writ of habeas corpus in the United States District Court for Colorado. The petition was dismissed, 167 F. Supp. 791, and appeal was perfected to the Court of Appeals for the Tenth Circuit. Prior to argument we granted certiorari.[2] 359 U. S. 906.

We first turn to respondent Guagliardo's contention that Article 2 (11) is nonseverable. As desirable as it is to avoid constitutional issues, we cannot do so on this ground. The Act provides for severability of the remaining sections if "a part of this Act is invalid in one or more of its applications." 70A Stat. 640. The intention of Congress in providing for severability is clear, and legal effect can be given to each category standing alone. See *Dorchy* v. *Kansas,* 264 U. S. 286, 290 (1924).

We believe that these cases involving the applicability of Article 2 (11) to employees of the armed services while serving outside the United States are controlled by our

---

[2] Since the offense occurred within the United States Area of Control of West Berlin, the Government now contends that petitioner Wilson is amenable to the military government jurisdiction of an occupied territory. However the charges were drawn in terms of Article 2 (11) power, and jurisdiction was sustained on that basis. Moreover the Court of Military Appeals refused to consider that issue when raised by the Government and the trial court did not rest its decision sustaining military jurisdiction over petitioner on that ground. This contention is consequently denied.

opinion in No. 22, *Kinsella* v. *Singleton, ante,* p. 234; and No. 58, *Grisham* v. *Hagan, ante,*. p. 278, announced today. In *Singleton* we refused, in the light of *Reid* v. *Covert,* 354 U. S. 1 (1957), to apply the provisions of the article to noncapital offenses committed by dependents of soldiers in the armed services while overseas; in *Grisham* we held that there was no constitutional distinction for purposes of court-martial jurisdiction between dependents and employees insofar as application of the death penalty is concerned. The rationale of those cases applies here.

Although it is true that there are materials supporting trial of sutlers and other civilians by courts-martial, these materials are "too episodic, too meager, to form a solid basis in history, preceding and contemporaneous with the framing of the Constitution, for constitutional adjudication." Concurring opinion, *Covert,* 354 U. S., at 64. Furthermore, those trials during the Revolutionary Period, on which it is claimed that court-martial jurisdiction rests, were all during a period of war, and hence are inapplicable here. Moreover, the materials are not by any means one-sided. The recognized authority on court-martial jurisdiction, after a careful consideration of all the historical background, concluded: "That a civilian, entitled as he is, by Art. VI of the Amendments to the Constitution, to trial by jury, cannot legally be made liable to the military law and jurisdiction, in time of peace, is a fundamental principle of our public law . . . ." [3] But it is contended that *Ex parte Reed,* 100 U. S. 13 (1879), is controlling because the forces covered by Article 2 (11) are overseas and therefore "in the field." Examination of that case, as well as *Johnson* v. *Sayre,* 158 U. S. 109 (1895), however, shows them to be entirely inapposite.

---

[3] Winthrop, Military Law and Precedents (2d ed. 1896), 143. See also, *Ex parte Milligan,* 4 Wall. 2, 121, 123 (1866); Maltby, Courts Martial and Military Law, 37; Rawle, Constitution (2d ed. 1829), 220; 3 Op. Atty. Gen. 690; 5 *id.,* at 736; 13 *id.,* at 63.

Those cases permitted trial by courts-martial of paymasters' clerks in the navy. The Court found that such a position was "an important one in the machinery of the navy," the appointment being made only upon approval of the commander of the ship and for a permanent tenure "until discharged." Also the paymaster's clerk was required to agree in writing "to submit to the laws and regulations for the government and discipline of the navy." Moreover, from time immemorial the law of the sea has placed the power of disciplinary action in the commander of the ship when at sea or in a foreign port. None of these considerations are present here. As we shall point out subsequently, a procedure along the lines of that used by the navy as to paymasters' clerks might offer a practical alternative to the use of civilian employees by the armed services. As was stated in the second *Covert* case, *supra,* at 23, "there might be circumstances where a person could be 'in' the armed services for purposes of Clause 14 even though he had not formally been inducted into the military . . . ."

The only other authorities cited in support of court-martial jurisdiction over civilians appear to be opinions by the Attorney General and the Judge Advocate General of the Army. However, the 1866 opinion of the Judge Advocate General (cited in support of the Government's position) was repudiated by subsequent Judge Advocate Generals.[4] To be sure, the 1872 opinion of the Attorney General, dealing with civilians serving with troops in the building of defensive earthworks to protect against threatened Indian uprisings, is entitled to some weight. However, like the other examples of frontier activities based on the legal concept of the troops' being "in the field," they are inapposite here. They were in time of

---

[4] See 16 Op. Atty. Gen. 13; *id.*, at 48; Dig. Op. JAG (1901), 563, ¶ 2023; *id.* (1895), at 599–600, ¶ 4; *id.* (1880), at 384, ¶ 4.

"hostilities" with Indian tribes or were in "territories" governed by entirely different considerations. See second *Covert,* at 12–13. Such opinions, however, do not have the force of judicial decisions and, where so "episodic," have little weight in the reviewing of administrative practice. Moreover, in the performance of such functions as were involved there, the military service would today use engineering corps subject to its jurisdiction. This being entirely practical, as we hereafter point out, as to all civilians serving with the armed forces today, we believe the *Toth* doctrine, that we must limit the coverage of Clause 14 to "the least possible power adequate to the end proposed," 350 U. S., at 23, to be controlling.

In the consideration of the constitutional question here we believe it should be pointed out that, in addition to the alternative types of procedure available to the Government in the prosecution of civilian dependents and mentioned in *Kinsella* v. *Singleton, supra,* additional practical alternatives have been suggested in the case of employees of the armed services. One solution might possibly be to follow a procedure along the line of that provided for paymasters' clerks as approved in *Ex parte Reed, supra.* Another would incorporate those civilian employees who are to be stationed outside the United States directly into the armed services, either by compulsory induction or by voluntary enlistment. If a doctor or dentist may be "drafted" into the armed services, 50 U. S. C. App. § 454 (i), extended, 73 Stat. 13; *Orloff* v. *Willoughby,* 345 U. S. 83 (1953), there should be no legal objection to the organization and recruitment of other civilian specialists needed by the armed services.

Moreover, the armed services presently have sufficient authority to set up a system for the voluntary enlistment of "specialists." This was done with much success during the Second World War. "The Navy's Construction Battalions, popularly known as the Seabees, were estab-

lished to meet the wartime need for uniformed men to perform construction work in combat areas." 1 Building the Navy's Bases in World War II (1947) 133. Just as electricians, clerks, draftsmen, and surveyors were enlisted as "specialists" in the Seabees, *id.*, at 136, provisions can be made for the voluntary enlistment of an electrician (Guagliardo), an auditor (Wilson), or an accountant (Grisham). It likewise appears entirely possible that the present "specialist" program conducted by the Department of the Army [5] could be utilized to replace civilian employees if disciplinary problems require military control. Although some workers might hesitate to give up their civilian status for government employment overseas, it is unlikely that the armed forces would be unable to obtain a sufficient number of volunteers to meet their requirements. The increased cost to maintain these employees in a military status is the price the Government must pay in order to comply with constitutional requirements.

The judgment in No. 21 is affirmed and the judgment in No. 37 is reversed.

No. 21, *affirmed.*
No. 37, *reversed.*

[For opinion of MR. JUSTICE HARLAN, joined by MR. JUSTICE FRANKFURTER, see *ante,* p. 249.]

[For opinion of MR. JUSTICE WHITTAKER, joined by MR. JUSTICE STEWART, see *ante,* p. 259.]

---

[5] See Army Regulations 600–201, 20 June 1956, as changed 15 March 1957, and Army Regulations 624–200, 19 May 1958, as changed 1 July 1959.