**UNITED STATES of America,**
**Appellant,**

v.

**Robert E. BOWEN, Appellee.**

**No. 18588.**

United States Court of Appeals
Fifth Circuit.

May 2, 1961.

E. Coleman Madsen, U. S. Atty., Miami, Fla., Charles K. Rice, Asst. Atty. Gen., Lavinia L. Redd, Asst. U. S. Atty., Miami, Fla., for appellant.

Robert E. Bowen, West Palm Beach, Fla., for appellee.

Before JONES and BROWN, Circuit Judges, and CONNALLY, District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal relates to the nature of the master's rights against an unfaithful servant. Here the master is the United States Government, the servant a former civilian engineer in the employ of the United States Engineers in Western Germany in 1951.

The District Court, after somewhat extensive pretrial hearings, denying the servant's motion for summary judgment but quashing notice of the Government to take testimony by oral deposition in Germany, entered an order dismissing the complaint for failure to state a claim. F.R.Civ.P. 12(b), 28 U.S.C.A. No opinion was filed and the order itself contains little illumination. From it and the Government's brief on appeal (none being filed by Bowen, the servant) we understand that the Court based this on two principal legal propositions. As to Counts I and II, the Court was of the opinion that the Government, as master, could not recover since the funds involved were those of the Western German Government, and in any event, the complaint failed to show how or in what manner the master, the United States, was damaged. As for Count III, the Court apparently concluded that a breach of fidelity was alleged but the Government's relief would be limited to the servant's salary for the overlapping time. The Government declined to amend to specify such damage so that claim was also dismissed.

We think that the Court was in error in each of these basic conclusions. This makes it both unnecessary and undesirable that we set forth much detail. It is undesirable since whatever we say in declaring why a case ought not to have been dismissed on pleadings alone seems always to plague the subsequent trial at every stage. See, for example, Fontainebleau Hotel Corp. v. Crossman, 5 Cir., 1961, 286 F.2d 926. We can only repeat what we oftentimes say that all we decide is that this complaint under the broad limits of the Rules states a claim. We cannot now predict what the facts will be either on a trial or developed in advance of trial which might demonstrate the absence of a genuine controversy of a material fact warranting summary judgment. Carss v. Outboard Marine Corp., 5 Cir., 1958, 252 F.2d 690, 693; Millet v. Godchaux Sugars, Inc., 5 Cir., 1957, 241 F.2d 264, 267. Nothing said or unsaid in this opinion is to be understood as a determination, or even an intimation, by us as to the ultimate decision of this case or any part of it.

In discussing these basic errors of the Trial Court, we think it essential to take note of a specific fact which leads to a like fundamental weakness in the Government's theory. The record amplified in part by interrogatories, requests for admissions, and the like expands the complaint somewhat to include as a highly controverted fact the time that Bowen, the servant, ceased active employment. According to him he entered on what he called terminal leave on April 6, 1951. The Government disputes that in point of fact, asserting that from then until June 19, 1951, he continued to engage in serious official duties. In any event, the Government argues, he was on pay status under the so-called terminal leave and he was therefore subject to all of the rigorous duties and obligations—equitable, legal and moral—attaching to the relationship of master-servant. It is conceded that after June 19, 1951, the relationship was severed altogether. As this case may now have to proceed through the difficult process of a trial a decade

after the events with much of the evidence available only through depositions [1] of German Nationals and military personnel now widely scattered, we think orderly administration requires that this basic question be settled.

We emphasize that we are dealing with an important, but limited, phase of the relationship between master and servant, between the Government and its civilian employees. We do not consider, nor do we decide, what the result should be in other areas such as prohibitions against corrupt political practices, e. g., 5 U.S.C.A. § 118, amendability to military discipline, cf. Grisham v. Hagan, 1960, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279; McElroy v. United States ex rel. Guagliardo, 1960, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282; Kinsella v. United States ex rel. Singleton, 1960, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268; Reid v. Covert, 1957, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148, or the like.

■ The key is found in the nature of the legal theory which holds a servant to accountability. The law exacts a faithful single-minded devotion to the interests of the master. In a situation in which he advances his self-interest while performing work for the master, the servant is not free to determine both for himself and the master what course the master should or would take. When the business at hand involves the performance of some act within the responsibility delegated to the servant, the law requires that the master's interest, and only the master's interest, be a factor. It is this responsibility to take some action in behalf of the master's interest which denies the servant the right to advance his own cause

■ But there is no need for the legal rule where the person formerly a servant is no longer one either in formal fact or in the sense of having any duties to perform or authority to do any act on the master's behalf. That certainly seems to be the case as to civilian employees on so-called terminal leave. More properly it should be called lump sum payment for accumulated or accrued annual leave on separation from service. 5 U.S.C.A. § 61b. See 1953 U.S.Code Cong. & Admin. News Vol. 1 pp. 167, 169, Vol. 2 pp. 1788, 1800 and 5 C.F.R. § 30; cf. 5 U.S.C.A. §§ 2061–2066. The person may be carried on payrolls and other records to satisfy statutory personnel standards and requirements. But it is essentially a part of deferred compensation for past services comprehending the payment of additional money for a specified time.[2] A former active civilian employee is not, however, required to remain idle. He is free to accept other employment. We see no purpose to be served—indeed we see much harm in—a rule which during the terminal period covered by the lump sum payments restricts freedom of employment by prohibiting work which involves dealing with the Government. If he may work for others who deal with the Government, he may work for himself in like work.

■ Consequently, if—and we emphasize the if—it is determined that Bowen's active employment ceased on April 6, 1951, so that he no longer had authority or responsibility to act on behalf of the Government, this will have significant effect. As to projects, contracts and related matters which, at any time prior to April 6, 1951, had not been handled by him or which were not within the re-

---

1. At one stage the Government served notice of taking of about a dozen oral depositions in Germany. Bowen moved to quash the notice and this was done presumably on the basic ground of a failure to state a claim. The Court never reached the question whether the circumstances were such as to call for an order under F.R.Civ.P. 30(b) for payment by the Government of deposition expenses incurred by the defendant and his counsel. See 4 Moore, Federal Practice § 30.14 at 2037, and 1960 supp. at 106; North Atlantic & Gulf S.S. Co., Inc. v. United States, 2 Cir., 1954, 209 F.2d 487.

2. It is interesting to note that the statute treats it as compensation for income tax purposes but not otherwise. "The lump-sum payment herein authorized shall not be regarded, except for purposes of taxation, as salary or compensation and shall not be subject to retirement deductions." 5 U.S.C.A. § 61b.

sponsibility of the Construction Branch of which he was assistant chief, Bowen was free to solicit and engage in the performance of work during the period of so-called terminal leave between such date and June 19. During that period, just as after its expiration, it was not unlawful to take full advantage of whatever knowledge and experience he may have gained from his previous employment. For like reasons, we think it quite permissible for such an employee during the pendency of his active service to make plans and preparations for private employment, either by self or others, to commence at the beginning of the terminal accumulated leave. This, of course, subjects him to an actual scrupulous avoidance of any conduct during active employment which in any way compromises the undivided loyalty and single-minded concern for the master's interests. On the other hand, as we point out hereafter, whatever was effectively planted during the period of active employment becomes illicit fruit subject to the heavy obligation of accounting.

That brings us to the allegations of the complaint. The essence of Counts I and II is that the United States Military Engineering Headquarters to which Bowen was assigned had a responsibility for approving the selection and employment of architect-engineering firms in connection with projects likewise approved for the use of United States forces in Western Germany. When approved a "Requisition Order Demand (Form 6-GA)" was executed by Bowen's superior. This 6-GA assured that on completion of the work or services covered by the requisition demand, such person would be paid by the West German Government. There is a suggestion that through the complex foreign aid programs of our Government, the funds ultimately came in part at least from the United States. But we treat it as though these were funds of the West German Government only.

In Count I it was first alleged that during the period of time we have described as terminal leave, Bowen had set up two foreign corporations through which engineering work would be done. The specific project to be constructed in Count I was the Rhine Engineer Depot. The 6-GA for this was not executed until June 19, 1951. It was alleged, however, that commencing about March 19–20, 1951 and while Bowen admittedly was still on active service, he solicited and negotiated with a German firm "for the purpose and objective that an agreement would be entered into whereby the [German] firm would be awarded a major construction project as a direct result of the defendant's influence and activities." Thereafter and still prior to April 6, 1951, Bowen negotiated further with the firm. This was followed by meetings in May in which Bowen demanded and obtained a 20% interest in the amount of the contract covering these professional services. The German firm, at Bowen's insistence, confirmed to the Army Engineers that Bowen was retained as a consultant on this project. Pursuant to this arrangement, the German firm paid Bowen a stated sum of Deutschemarks amounting approximately to $30,000 in American money.

Count II is a little more complicated. It realleges, of course, the steps taken during the terminal leave period to establish the two corporations. But the gist of this claim was the formation of a "working circle" of six Germans firms to whom were ultimately assigned a number of 6-GA's and with whom Bowen had made a similar fee splitting arrangement. According to the complaint the origin of the group and Bowen's relation to it was entirely legitimate. The specific problem facing the Army was the desirability of obligating available construction funds which would revert to the West German Government if not obligated prior to the end of the German fiscal year on March 31, 1951. Consequently, with the authority and concurrence of his superior, Bowen convoked a conference on March 29, 1951, of a number of prominent German firms. Upon his proposal, an organization was formed, to whom the 6-GA's were to be issued. The actual projects were to be thereafter al-

located among the constituent members. But, the complaint goes on, entirely without authority and in direct conflict with his duties, he represented to these persons that he would use his influence with his associates at the Army to secure allocation of projects to this working circle and its members. For that he would expect to obtain a 20% fee. A number of projects were awarded under 6-GA's issued prior to April 6, 1951. On at least one of them Bowen signed for his superior officer. Others were issued between April 6, 1951 and June 19, 1951, and others still later. All of them were allocated to constituent members and actual work commenced on each project before May 31, 1951. The working circle set up an administration office which was located in the same building with the Army Engineers. All of the 6-GA's openly reflected such address.

There are two elements in the problem: first, did the 20% interest of Bowen, the servant, in the particular project constitute a breach of fidelity? Second, if so, what relief or remedy is available to the Government as master? The District Court apparently thought that the complaint adequately set forth a claim of breach of fidelity. Dismissal was on the ground that the complaint, perhaps as expanded by other papers, F.R.Civ.P. 12(b), showed that it was not money of the United States, and failed to show in any way that the United States had been damaged.

■ We also assume that the complaint alleged the first element. We have discussed at some length our conclusion that subsequent to the date Bowen actually went on so-called terminal leave, if he did, he owed no duty as to new work and new projects. But the matter is different as to any project which was allocated prior to that date or which, though formally allocated at a later time, was a matter pending in the Construction Branch during Bowen's active employment. To the extent that evidence ultimately offered warrants such inferences, it would be contrary to law for Bowen to have had any interest in any such con-

tracts or the proceeds or fees paid thereunder whether to him directly or through any other channels. Bishop v. United States, 5 Cir., 1959, 266 F.2d 657, 661.

That presents the second element, the nature and extent of relief. On this we think the District Court proceeded on an erroneous approach. The Court in colloquy looked upon it as a simple breach of contract. So viewing it, the Court finds no damage, even assuming a breach. But that is too narrow a view. The duty of absolute fidelity between master and servant reflects ethical and moral standards of good faith inherent in many relationships of trust and mutual confidence. The difficulty of the master being able to discover duplicity in dealings or the likelihood of harmful consequences if discovered is the very reason which gives rise to the legal rule that compels a full, complete accounting by the unfaithful servant.

■ It is the action of undertaking to act in self-interest while compelled to act solely for the master's interest which subjects the servant to the duty to account. Neither bad faith on the part of the servant or damage on the part of the master is essential to set it in train. The master as the party whose trust has been betrayed has the widest relief. He is entitled to all of the fruits of the servant's dereliction. Bishop v. United States, supra; Nye v. Lovelace, 5 Cir., 1956, 228 F.2d 599, 603; Hunter v. Shell Oil Co., 5 Cir., 1952, 198 F.2d 485.

■ The fact that this work was being paid for either initially or finally by the German Government did not lessen the interests of the United States in these projects. Neither did it diminish the necessity that the United States Government have the benefit of the untrammeled judgment of its servant in the approval of projects and the selection or allocation of contracts for construction or professional services. While the United States Government did not, therefore, stand to profit out of any projects being performed through the West German Government, it has the right, as does any other

employer, to recoup whatever profits the unfaithful servant may have received. The policy of the law is to protect those who are the victims of infidelity. It is a recognition that simple reimbursement or restitution of actual loss is inadequate either to protect or to deter. That would put a premium on breach of duty. The servant must realize that when transgressions are discovered he must account fully to the master. Where dereliction of duty is clearly established, doubts as to accountability may well be resolved against the one having the duty to account. Bynum v. Baggett Transportation Company, Inc., 5 Cir., 1956, 228 F.2d 566, 573–574; Smith v. United States, 5 Cir., 1961, 287 F.2d 299, at page 303, at headnote [6].

■ As to any such projects in which Bowen, either directly or through some other entity, had a pecuniary interest which would constitute a breach of his duty, he must make an accounting.

■ Count III has to do with an Engineer Depot and an Ordnance Depot in France far removed from the geographical zone of Bowen's duties. He had nothing to do with the awards of these contracts, the allocation of engineering services, or the like. His interest was acquired from a predecessor engineering concern. The dates are not specifically alleged, but it seems quite probable that this was subsequent to the time of so-called terminal leave of April 6, 1951. If, as seems likely from the allegations, this occurred subsequent to such time, the Government probably has no claim whatsoever assuming, as discussed above, that Bowen was actually on an inactive terminal leave pay status. If, on the other hand, his ultimate acquisition had its genesis in activities taken while on active service and under circumstances constituting a breach of fidelity, the Trial Court's ruling was erroneous in limiting recovery to the wages received by Bowen during this overlapping period. The salary is not the limit of recovery. As discussed above, the duty is to account fully.

We emphasize again that we do not know what the facts are. We have no way of knowing now whether the facts will show a breach of fidelity as to any projects covered in Counts I, II or III. Nor, assuming a breach of duty is made out, do we know now what the final accounting will comprehend or reflect. All such matters are for the further consistent proceedings in the Trial Court.

Reversed and remanded.