Ralph L. **BELL**

v.

Warden John J. **CLARK**, etc.

Civ. A. No. 509–69.

United States District Court
E. D. Virginia,
Richmond Division.

Jan. 2, 1970.

**385**

George E. Allen, Sr., Allen, Allen, Allen & Allen, Richmond, Va., for plaintiff.

David G. Lowe, Asst. U. S. Atty., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This matter comes before the Court on Bell's petition for a writ of habeas corpus. Respondent has answered, and the Court has conducted an evidentiary hearing and heard argument of counsel. Jurisdiction of the Court is attained by virtue of Title 28 U.S.C. § 2241.

Bell is presently confined to the Federal Reformatory, Petersburg, Virginia, as a consequence of a conviction by a general court-martial for the crime of rape, as set forth in Article 120 of the Uniform Code of Military Justice, 10 U.S.C. § 920.

The Court finds that on September 16, 1965, Bell was a Private First Class serving with the United States Army, "A" Battery, 2d Battalion, 18th Artillery, then stationed in Germany. At the time of the offense for which he was convicted Bell was off duty, in civilian clothes, approximately five miles from the military base at which he had been quartered, and the victim of the crime was a German national. In short, and pursuant to judicial guidelines, the crime to which he pled guilty and for which he is now confined was non-service connected. See O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

Shortly after the commission of the crime Bell was apprehended and the German authorities waived the primary jurisdiction which accrued to them, see Wilson v. Girard, 354 U.S. 524, 77 S.Ct. 1390, 1 L.Ed.2d 1532 (1957) pursuant to Article 19 of the North Atlantic Treaty Organization, Status of Forces Agreement. In accordance with said waiver by the German authorities a general court-martial was convened at Giessen and Frankfort/Main, Germany, resulting in his conviction on January 24, 1966, wherein he was ordered to be dishonorably discharged from the service, to forfeit pay and allowances, and to be confined at hard labor for seven years and reduced to the grade of E-1. Since his arrest shortly after the crime to which he pled guilty he has been confined, first in a military stockade and presently in the Federal Reformatory at Petersburg, Virginia.

Bell contends that the military was without jurisdiction to try him for the non-service connected offense, and that by their so doing he was denied his procedural rights of trial under a grand jury indictment and trial by jury secured to him by Article III, § 2, and the Fifth and Sixth Amendments to the Constitution of the United States. He argues further that these rights could only be insured by a trial in an American civil court, and consequently such court was the only forum which had jurisdiction to try him. Petitioner contends that he is entitled to his release by virtue of the pronouncements of the United States Supreme Court in the case of O'Callahan v. Parker, *supra.*

Factually, the *O'Callahan* case was strikingly similar to the instant case in that O'Callahan, a member of the military, was convicted by general court-martial of attempted rape of a civilian while he was off duty, dressed in civilian clothes, and off military base, the alleged offense having taken place in a hotel in Honolulu, Hawaii. The Court in

that instance held that there was not the remotest connection between O'Callahan's military duty and the crime in question, and that as a consequence a general court-martial was without jurisdiction to try him, "but rather [he] was entitled to trial by the civilian courts." 395 U.S. at 274, 89 S.Ct. at 1692.

Factual similarities are only the beginning of a trial court's inquiry as to the law to be applied in any given case. The thrust and purpose of the precedent or precedents upon which a litigant relies must be considered in detail. A cursory comparison between a given factual pattern, or more specifically the factual situation in the instant case and that which was found to exist in *O'Callahan* might, without more, result in an unconstitutional vitiation of the scope and purpose of the precedent of *O'Callahan* and render its dictates meaningless. It is not sufficient to conclude any such legalistic journey by using any such factual comparison as the sole criteria in determining a case's applicability. To the contra, such a factual comparison is only the beginning of the process leading to a court's ultimate conclusion.

Congress has the delegated power "to make rules for the Government and Regulations for the land and naval Forces," Art. I, § 8, cl. 14, United States Constitution. This power of regulation has also been judicially determined to spring from Art. IV, § 3, see In re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891). Pursuant to these enumerated grants of power, a court-martial's jurisdiction was recognized as a constitutionally perfected exercise of power permitting criminal prosecutions of civilian dependents of service men stationed outside the continental limits of the United States, and civilian employees of the military stationed overseas. See e. g. In re Varney, 141 F.Supp. 190 (S.D.Cal. 1956); United States v. Burney, 66 U.S.C.M.A. 776 (1956).

It has been held that where trial by court-martial was otherwise proper, certain procedural safeguards afforded defendants in trials conducted by civil courts were not constitutionally required, Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942).

It was in the middle and latter part of the 1950's that the then seemingly inviolate domain of court-martial jurisdiction was attacked. The result of these attacks culminated in certain United States Supreme Court opinions which went directly to the principle of the delegated constitutional authority of Congress to create criminal jurisdiction in courts martial.

In 1955 in Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8, it was stated, "Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to 'the least possible power adequate to the end proposed'," *Id.* at 22–23, 76 S.Ct. at 8. The Court there concluded that the jurisdiction of the courts martial did not reach discharged soldiers for crimes allegedly committed while in service.

This decision was followed in 1957 by Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148, attacking the right of courts martial to try civilian dependents of military personnel stationed overseas who had committed capital offenses; and in 1960 by Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (manslaughter).

The *Kinsella* case involved the wife of a soldier. The principle enunciated therein was, at the same term of court, extended to civilian employees of the army attached to a military installation overseas. See also, McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282, same term of court.

In Reid v. Covert, *supra*, the Court held that under the grand design of the constitution, civil courts are the normal repositories to try persons charged with crimes against the United States. The Court refers to the intention by the Constitution to protect persons brought before civil courts, referring specifically to Article III and the Fifth, Sixth and

Eighth Amendments, which establish the right to trial by jury, indictment by a grand jury, and other specific safeguards. Jurisdiction of military tribunals was, by way of contrast, held to be very limited and described by Mr. Justice Black as extending jurisdiction "derived from the cryptic language in Art. I, § 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law." It was therein held that the Congressional power authorized in Art. I, § 8, Cl. 14, was limited to persons who could be considered "in" the land or naval forces. Nor, that Court concluded, was Art. I, § 8, Cl. 18, an expansion of the grant enabling Congress to establish court-martial jurisdiction over a service man's dependents. The Court therein held that Congress was without "power" to include such a person within court-martial jurisdiction, and since the petitioner in that case had been tried in a forum without jurisdiction, it followed that she had been denied the procedural guarantees secured by Art. III and the Fifth and Sixth Amendments to the Constitution of the United States. This opinion, while setting what then appeared to be new limits on Congressional power, reiterated the demise of the In re Ross, *supra*, approach that "The constitution can have no operation in another country."

The *Reid, Kinsella* et al., cases, *supra*, went to the threshold determination of Congressional power.

There sprung from the cases of the 1950's a dichotomy in which a distinction was made between civilian personnel working for the military and dependents of the military stationed overseas and personnel "in" the armed services. This dichotomy led to the conclusion that "status" was the determining factor as to court-martial jurisdiction over one charged with a crime.

We come now to O'Callahan v. Parker, *supra*, which opinion will and has indeed already become a well used vehicle by military personnel convicted by court-martial of non-service connected crimes, and indeed it was so intended for appropriate cases. In that case the attack was based on deprivation of constitutional rights as distinguished from an attack on congressional power. *O'Callahan*, at the outset, recognizes that court-martial jurisdiction is constitutionally permitted when exercised in its "appropriate sphere." See also, Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). *O'Callahan* likewise states that "Status is necessary for [court-martial] jurisdiction." It is in this Court's opinion significant that Mr. Justice Douglas, at that stage of the *O'Callahan* opinion, indicates that the ascertainment of "status" does not complete the inquiry. Indeed it is obvious that there must follow inquiry as to the nature, time and place of the offense. There is nothing in the *O'Callahan* opinion to dispel the principle that if otherwise proper, trial under a grand jury indictment and trial by petit jury are not required. See also, Ex parte Quirin, *supra*, 317 U.S. at 140, 63 S.Ct. 1; Reid v. Covert, *supra*, 354 U.S. at 37, 77 S.Ct. 1222.

■ *O'Callahan* did admittedly adhere to the admonition contained in the *Reid* case, 354 U.S. at 39, 77 S.Ct. at 1242, to the effect that "Slight encroachments create new boundaries from which legions of power can seek new territory to capture," and did, however, cut into the jurisdiction of courts martial. The Supreme Court granted certiorari limited to the following issue:

Does a court-martial, held under the Articles of War, Tit. 10 U.S.C. § 801 et seq., have jurisdiction to try a member of the Armed Forces who is charged with commission of a crime *cognizable in a civilian court* and having no military significance, alleged to have been committed off-post and while on leave, thus depriving him of his constitutional rights to indictment by a grand jury and trial by a petit jury in a civilian court?" [Emphasis added.] O'Callahan v. Parker, 393 U.

S. at 822, 89 S.Ct. at 1685, 23 L.Ed.2d 291.

The Court held that under the factual pattern existing, the off-duty soldier, O'Callahan, was deprived of his constitutional guarantees and that the court-martial under which he was convicted was without jurisdiction. Hence it is obvious that "status", standing alone, is not sufficient to confer court-martial jurisdiction in every case. It is, as stated by Mr. Justice Douglas, merely the beginning of the inquiry, not its end, *O'Callahan, supra,* 395 U.S. at 267, 89 S.Ct. 1683. As heretofore stated, to complete the inquiry one must consider the nature, time and *place* of the offense.

In making that inquiry in the instant case, the immediate distinction is that the crime of which O'Callahan was accused was committed within the territorial limits of the United States, where indeed civil courts were available to render unto him all rights afforded by the Constitution. The majority opinion specifically makes reference to the fact that civil courts were open and "the offenses were committed within our territorial limits, * * * ". In the instant case, Bell's crime was committed in a foreign land against a foreign national. With but few exceptions, see e. g. 18 U.S.C. § 1111, our federal criminal statutes are inapplicable to extra-territorial acts and crimes committed abroad and thus not "offenses against the United States," which District Courts are properly constituted to try. 18 U.S.C. § 3231.

This is not to say that Congress is without power to extend the application of a criminal statute to extra-territorial acts of United States citizens, United States v. Bowman, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922); Chandler v. United States, 171 F.2d 921 (1st Cir. 1948), cert. den. 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1945). Indeed, pursuant to the United States Constitution, Art. II, § 2, Congress enacted 18 U.S.C. § 3238 to provide a forum for trial of offenses against the United States law "not committed within any state." U.S. Const., Art. III, § 2.

The crime of rape, which is indictable in a civilian court, is limited to acts done "within maritime and territorial jurisdiction." 18 U.S.C. § 113. The offense of rape which Bell committed, therefore, was not indictable in a civilian court. See 18 U.S.C. § 7 (defining territorial and maritime jurisdiction.) Unlike *O'Callahan,* the doors of civilian courts were, for all practical reasons, closed.

This Court considers the distinction critical and determinative. The exercise of congressional power pursuant to Art. I, § 8, Cl. 14 of the United States Constitution was not contested in *O'Callahan.* The Court there recognized the "status" of O'Callahan and the general grant of power given to Congress. However, O'Callahan's conduct was indictable and triable in an American civil court and the Court, in concluding the court-martial was without jurisdiction, stated that "it is assumed that an express grant of general power to Congress is to be exercised in harmony with express guarantees of the Bill of Rights." *O'Callahan v. Parker, supra,* 395 U.S. at 273, 89 S.Ct. at 1691. Thus, while recognizing petitioner's status and adhering to the general grant of power given to Congress, the presence of the ability to try O'Callahan in an atmosphere conducive to procedural safeguards was overbearing and in effect dissolved the otherwise assumedly valid court-martial jurisdiction. This finding, of course, was made in conjunction with the finding of an absence of service connection.

In the present case, however, Bell was not amenable to trial in a civil court. Thus, the alternative of American forums was never open to him. The circumvention of procedural rights through trial by court-martial was non-existent. The civil courts do not have concurrent jurisdiction with military tribunals to

try crimes arising under the Uniform Code of Military Justice. See 10 U.S.C. § 821.

This Court interprets the *O'Callahan* application to be restricted to non-service connected crimes committed by service men at a place where jurisdiction by civil courts guaranteeing the application of constitutional rights is available. In short, while the initial prerequisite of status is met, as in the instant case, and Congress has established jurisdiction under its general powers, and alternatives do not exist, as a practical matter, which would insure such a defendant of trial by civilian courts, this Court is of the opinion that such a defendant has not had any constitutional rights taken from him, and indeed Congress by authorizing such military trial has not transgressed privileges secured by the Bill of Rights. Bell may well have been left to trial by the German authorities. This, however, is not decisive to the Court's ruling.

The issue before this Court is whether any constitutional rights of Bell were infringed upon by submitting him to trial by court-martial, and if this were so, there would be nothing to prevent this Court from so holding.

As heretofore stated, if the military had, under *O'Callahan*, been prohibited from trying Bell, he undoubtedly would have been tried by the German authorities, if tried at all. Such a trial would not have been violative of any of his constitutional rights. See Wilson v. Girard, *supra*. Neither are we presented here with a matter in which conduct has been denominated a crime cognizable under the Uniform Code of Military Justice but not, because of its label, cognizable in a civil court. See 10 U.S.C. § 934; U.C.M.J. Art. 134; see discussion in *O'Callahan*, *supra*, as to the threat of vagueness inherent in Art. 134.

Having concluded that no rights of the petitioner were violated by trial by general court-martial under the circumstances existing in the instant situation, the Court does not reach any issue as to the retroactivity of *O'Callahan*. A well-reasoned opinion in this connection, however, is found in the case of Gosa v. Mayden, 305 F.Supp. 1186 (N.D.Fla. 1969).

An order consistent with this memorandum will be entered.