UNITED STATES, Appellee,

v.

Private First Class Jeffery M. SINGLE-TON, SSN 267–69–2429, United States Army, Appellant.

CM 442191.

U. S. Army Court of Military Review.

19 Jan. 1983.

Colonel Edward S. Adamkewicz, Jr., JAGC, Captain Peter R. Huntsman, JAGC, and Major Robert C. Rhodes, JAGC, were on the pleadings for appellant.

Colonel R.R. Boller, JAGC, Major John T. Edwards, JAGC, Major Joseph A. Rehyansky, JAGC, and Captain James C. Underhill, Jr., JAGC, were on the pleadings for appellee.

Before FULTON, COKER, and NAUGHTON, Appellate Military Judges.

## OPINION OF THE COURT

COKER, Judge:

Before a general court-martial at Nellingen, Federal Republic of Germany (FRG), appellant pleaded guilty to charges, among others, of wrongfully possessing 855.06 grams of marijuana and wrongfully conspiring to import marijuana into the FRG

in violation of the Uniform Code of Military Justice (UCMJ), Articles 81, 134, 10 U.S.C. §§ 881, 934 (1976). His approved sentence extends to reduction to the lowest enlisted grade, forfeiture of all pay and allowances, confinement at hard labor for 20 months, and a bad-conduct discharge from the service. The issue we must resolve is whether the importation of drugs into the FRG is an offense under the UCMJ. We hold that it is.

The facts in this case are not in dispute. While in The Netherlands, the appellant used marijuana. He and a fellow servicemember jointly purchased a large amount of marijuana with the intent of taking it back to the FRG, in which country their unit was located. At the border crossing point between the FRG and The Netherlands, their car was searched by German officials, the illicit drugs found, and these charges resulted.

Appellant argues that the United States has no legitimate interest in such conduct, as it occurred outside United States territory, and no authority to proscribe it, as the conduct violates only foreign law designed to protect territorial integrity. He further alleges the conduct has no direct connection to discipline in the service.

■ The authority or power of a nation to impose criminal sanctions on the conduct of its citizens exists whether the conduct occurs within its own geographical territory, or within the territory of another nation. *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955); *see also United States v. Gould,* 13 M.J. 734 (A.C.M.R.1982). The jurisdiction of the military to exercise this authority for the United States over military members has been established by statute. Article 2, UCMJ, 10 U.S.C. § 802 (1976 and Supp. III 1979). The appellant has confused this basic national authority with the right of a nation *to exercise* that authority. It is precisely this issue of *consent to exercise* sovereign authority that is addressed by the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of their Forces, 19 June 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846 (NATO SOFA).

■ The period following World War II saw, for the first time, large numbers of foreign military forces being stationed within a friendly nation. The formula of the NATO SOFA was the method developed to express the consent of nations to foreign armies being stationed in their territory during peacetime. It is a compromise between norms: the necessity inherent in sovereignty for a nation to control and discipline its own military forces and the necessity also inherent in sovereignty for a nation to control conduct that occurs within its territory. The NATO SOFA formula preserves these two aspects of sovereignty. The first norm is protected by the receiving State accepting the foreign armed forces and consenting to the *exercise of sovereignty* by the sending State through the exercise of jurisdiction by its courts within the territory of the other. The receiving State preserves the second norm and its own sovereignty through the consent to exercise its authority over the members of the sending State force. When these competing norms overlap, the NATO SOFA gives the primary right *to exercise* jurisdiction to the State most concerned. If the concern is primarily with the military force itself or its activities, jurisdictional authority is given to the sovereign of the force. Conversely, if the concern is primarily with the integrity of the territory or its people, jurisdictional authority is given to the territorial sovereign. The nations agreed to be sympathetic to the needs and desires of each other and generally to waive their jurisdictional authority when so requested. This basic formula has been generally accepted and implemented by the community of nations, to include the Soviet Union and the Warsaw Pact nations. S. Lazareff, *Status of Military Forces Under Current International Law,* Ch. 1–4 (1971). The NATO SOFA is not concerned with national decisions on what types of conduct will be criminal or, on which, if any, court will exercise jurisdictional authority over the conduct. The NATO SOFA grants to the United States consent to exercise sovereign author-

ity within the FRG through the mode of United States military courts.

Without question, the abuse of drugs can and does have a deleterious impact on the ability to accomplish the mission of the armed forces. Aggressive action by all levels of command continues in an effort to alleviate and solve this problem. *See* Amendments to the Military Selective Service Act of 1967, § 501, Pub.L. No. 92–129, 85 Stat. 348, 361 (1971); Army Regulation 600–50, *Standards of Conduct for Department of Army Personnel,* 15 August 1982; Army Regulation 600–85, *Alcohol and Drug Abuse Prevention and Control Program,* 1 December 1981. The extreme seriousness of the problem has received judicial recognition. *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *United States v. Trottier,* 9 M.J. 337 (C.M. A.1980). Continued Congressional attention and concern are evident. *See Drug and Alcohol Abuse in the Armed Services: Joint Hearing Before the Subcomm. on Manpower and Personnel and the Subcomm. on Preparedness of the Senate Comm. on Armed Services,* 97th Cong., 1st Sess. (1982); *Drug Abuse in the Military— 1981:* Hearing before the *House of Representative Select Committee on Narcotics Abuse and Control,* 97th Cong. 1st Sess. (1981). *See also* 21 U.S.C. §§ 801–904 (1976 and Supp. II 1978); para. 127c, Manual for Courts-Martial, United States, 1969 (Revised edition) (MCM, 1969 (Rev.)) (as amended by Executive Order No. 12383, 23 September 1982).

Particular concerns for customs activities are expressed in Articles XI and XIII of the NATO SOFA; yet, these provisions should not be confused with disposition of criminal conduct. The NATO SOFA separates customs and criminal activities. Passage of goods across the FRG borders by United States personnel, however, is of great importance as exemplified by supplementary agreements between the United States and the FRG on customs-related activities.

United States obligations under these treaties have been implemented partially by the United States military through regulations. *See* United States Army, Europe, Regulations 550–175, *Border Crossings and Customs Control in Germany,* 9 Feb 1973, and 632–10, *Standards of Conduct and Fitness,* 5 Nov 1981. The first of these regulations prohibits the importation and exportation of controlled substances across the FRG borders.* The second prohibits any activity related to drug abuse paraphernalia.

The United States has clearly proscribed the export of any controlled substance from the United States customs territory (this does not include any foreign nation) and likewise prohibited the importation from any locale of such drugs into the U.S. customs territory, 21 U.S.C. §§ 951–966 (1976 and Supp. II 1978). Of particular note is 21 U.S.C. § 953 (1976 and Supp. II 1978), which incorporates into United States law three international agreements that address the control of drug traffic between nations. There is a clearly enunciated proscription by the United States, through federal laws, international agreements, and military laws, of drug abuse generally but specifically to include the importation and exportation of controlled substances. The wrongfulness of this type of conduct is apparent.

■ The question is whether there is a clear and discernable interest by the United States and its military services in preventing the importation of controlled substances by military members into an allied country where large numbers of United States military personnel are stationed. In many allied countries, to include the FRG, the United States military has a duty by treaty obligation to prevent such conduct. Article II of the NATO SOFA, imposes on the United States the duty to take necessary measures to ensure that its members respect the law of any receiving State. *United States v. Hansford,* 46 C.M.R. 670 (C.G.C. M.R.1972). Every breach of the law of an allied country is not an offense under the

---

* The punitive nature of this regulation is before this Court in another case. We express no opinion on that issue, but merely recognize the publication of a regulation, indicating that such conduct is not condoned.

UCMJ. A foreign law, however, is evidence of the wrongfulness of the proscribed conduct in that foreign locale as well as in United States territory. Enunciated national policy provides evidence of the potential impact of conduct on national interests. If wrongful conduct impacts on the military mission of the United States with sufficient directness and severity, there is a resulting prejudice to good order and discipline. Where the conduct is public, violative of local law, and infringes on enunciated national interests, there is a clear injury to the reputation of and a clear discredit to the armed forces. Certainly the services suffer a loss of esteem when its members are caught importing illegal drugs. Such conduct is proscribed by Article 134, UCMJ; MCM, 1969 (Rev.), para. 213*b* and *c.*

The United States has created national restrictions on the exercise on judicial jurisdiction by its military services. That authority is limited to that deemed essential for maintaining discipline within the forces in active service. *United States ex rel. Toth v. Quarles, supra; Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); *McElroy v. Guagliardo,* 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960); *United States v. Averette,* 19 U.S.C.M.A. 363, 41 C.M.R. 363 (1970). The Court of Military Appeals has spelled out in detail the adverse impact that commerce in drugs has on the discipline of the armed forces. *United States v. Trottier,* 9 M.J. 337 (C.M.A.1980). Profits in drugs require a market and distribution. *Id.* at 350. Sale to other military personnel is a reasonably foreseeable result of possession of drugs by one servicemember. *Id.* at 349. Indicators of drug abuse are marginally visible, yet it has disastrous effects on the fitness of personnel to respond to military duties. *Id.* at 346. Almost every involvement by service personnel in the United States with the commerce in drugs is service connected. *Id.* at 350.

Drug abuse, in all of its forms, has clearly been condemned by the United States military services. The appellant was on notice that this specific type of conduct was prohibited. No servicemember today can doubt that commerce in controlled substances is strongly prohibited as a direct and adverse impact on military preparedness and mission performance. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). The apparent result of importing controlled substances into a foreign country, where large numbers of United States military personnel are stationed, is to directly undermine the discipline of those forces. It is equally apparent that this type of conduct causes a direct and public injury to the reputation of the military service in the foreign country.

The findings of guilty and the sentence are affirmed.

Senior Judge FULTON and Judge NAUGHTON concur.