EFFRON, Senior Judge
(concurring in part and in the result):
Appellant, an Iraqi national, worked as a civilian employee for a Department of Defense (DoD) contractor during the period of major American combat operations in Iraq. See Article 2(a)(10), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 802(a)(10) (2006) (providing for court-martial jurisdiction over persons “serving with or accompanying an armed force in the field” during a “contingency operation”). At trial and on appeal, he has contested the jurisdiction of his court-martial on both statutory and constitutional grounds.
The majority opinion affirms Appellant’s conviction, but on grounds broader than necessary for the resolution of this case. For the reasons set forth below, I concur only with respect to: (1) Part II.C. of the majority opinion (addressing jurisdiction from the perspective of Appellant’s status as a host-country national whose conduct was excluded from Article III coverage by statute); and (2) Part III of the majority opinion (disposing of the nonjurisdictional issue regarding Charge III based upon this Court’s recent decisions). Beyond those matters, the case before us does not provide an appropriate vehicle for resolving the broader issues addressed in the majority opinion.
I. PROSECUTION OF DOD CIVILIANS AND DOD CONTRACTOR EMPLOYEES IN ARTICLE III COURTS AND IN COURTS-MARTIAL
Over the past decade, American military forces have conducted major combat operations in Iraq and Afghanistan. During this period, DoD civilians and DoD contractor employees have provided critical support to the armed forces. Among those civilian employees, a number have engaged in misconduct sufficiently serious to result in prosecution for crimes committed in the theater of operations. The government has prosecuted these eases under the Military Extraterritorial Jurisdiction Act (MEJA), 18 U.S.C. §§ 3261-3267, and under Article 2(a)(10), UCMJ.

Prosecutions in the Article III courts

According to the Department of Justice:
The Military Extraterritorial Jurisdiction Act [MEJA], 18 U.S.C. § 3261, et seq., is the principal Federal statute used to prosecute certain U.S. Government employees, contractors, and their dependents who commit crimes overseas ....
Since MEJA was enacted, the Justice Department has successfully prosecuted numerous MEJA cases involving former Department of Defense employees or individuals accompanying them overseas.
Holding Criminals Accountable: Extending Criminal Jurisdiction to Government Contractors and Employees Abroad: Hearing Before the S. Comm. on the Judiciary, 112th Cong. 2 (2011) (statement of Lanny A. Breuer, Assistant Attorney General), available at http://www.judiciary.senate.gov/pdf/ 11-6-25% 20Breuer% 20Testimony.pdf.
As an example of a successful prosecution under MEJA, the Department of Justice cited United States v. Brehm, No. l:ll-cr-ll, 2011 U.S. Dist. LEXIS 33903, 2011 WL 1226088 (E.D.Va. Mar. 30, 2011), appeal docketed, No. 11-4755 (4th Cir. Jul. 29, 2011). Brehm bears many similarities to the appeal now before us — a foreign national employed by a DoD contractor who stabbed another foreign national and was apprehended by American military personnel. In Brehm, the incident led to federal civilian charges, trial in the Eastern District of Virginia, conviction, and sentence to forty-two months of confinement.

Prosecution in courts-martial

Since 2006, Article 2(a)(10), UCMJ, has provided statutory authority for the prosecution of civilians accompanying the armed forces in the field during contingency operations. Although the armed forces and mili *280 tary contractors have employed a large number of civilians in Iraq and Afghanistan during that period, the UCMJ has not been a significant factor in the prosecution of misconduct by civilians. In contrast to the prosecution of numerous civilians under MEJA, the parties in the present case have identified only one civilian convicted under the UCMJ during the conflicts in Iraq and Afghanistan — Appellant, a host-country national. The charges against Ali, like the charges against Brehm, grew out of an assault with a knife on another foreign national. Ali received a court-martial sentence of confinement for five months, reduced to 115 days as a result of a plea agreement. Unlike Brehm, who received a much longer sentence at his trial in the Eastern District of Virginia, Ali was not subject to Article III jurisdiction under MEJA. See 18 U.S.C. §§ 3267(1)(C), 3267(2X0 (excluding host-country nationals from coverage under MEJA).
II. UCMJ JURISDICTION OVER APPELLANT
The minimal use of UCMJ jurisdiction over civilians does not diminish the importance of the case to the parties before us, but it suggests caution as to the range of issues that should be resolved in this case. The appeal before us involves a narrow record focusing on a unique statutory niche occupied by this Appellant, a host-country national whose conduct in the theater of operations was excluded from Article III coverage under MEJA.
Part II.C. of the majority opinion upholds the constitutionality of UCMJ jurisdiction over Appellant. 71 M.J. at 270 (observing that in the absence of Article III coverage of Appellant’s conduct under MEJA, court-martial jurisdiction may be sustained under the Constitution because the UCMJ provides the “least possible power adequate to the end proposed” under the circumstances of the case) (citing Toth v. Quarles, 350 U.S. 11, 23, 76 S.Ct. 1, 100 L.Ed. 8 (1955)). I agree with that portion of the opinion. Although the legislative history of the MEJA exclusion for host-country nationals is not extensive, it reflects congressional sensitivity to the interests of a host country in prosecuting its own citizens, an appropriate consideration under the military and foreign affairs powers of Congress. See H.R.Rep. No. 106-778, pt. 1, at 21 (2000); see also Report of the Advisory Committee on Criminal Law Jurisdiction Over Civilians Accompanying the Armed Forces in Time of Armed Conflict, at 61 (Apr. 18, 1997) (reflecting concern about “unnecessary conflicts of jurisdiction and other difficulties” that could arise if Article III jurisdiction under the proposed statute covered host-country nationals). I also agree with the majority’s decision to not address the constitutionality of UCMJ jurisdiction over other civilians.
III. JURISDICTION IN CIRCUMSTANCES NOT AT ISSUE IN THE PRESENT APPEAL

The open question

The portion of the majority opinion that discusses the rights of foreign nationals is not necessary to the disposition of the present case. The case before us involves the very narrow question of court-martial jurisdiction over a host-country national excluded from Article III coverage under MEJA. A very different constitutional question — an open question — would arise under the “least possible power adequate to the end proposed” test if the conduct at issue involved a DoD civilian or DoD contractor employee who, as third-county national, would be subject to Article III coverage under MEJA.
The constitutional importance of considering the availability of Article III coverage has been underscored by the government’s recent appellate filing in Brehm, a MEJA case involving a third-country national: “By authorizing the trial of civilians in an Article III court, MEJA bestows on such persons all of the constitutional guarantees accorded by Article III and the Bill of Rights, and thus does not implicate the concerns about depriving civilians of those protections when they are tried by court-martial.” Brief for Plaintiff-Appellee at 38 n. 11, United States v. Brehm, No. 11-4755 (4th Cir. Feb. 14, 2012). In Brehm, the government’s filing addressed *281 the issue of court-martial jurisdiction over civilians under Article 2(a)(10), UCMJ, in the context of current contingency operations, candidly acknowledging that the constitutionality of the UCMJ provision presents an “open question.” Id. at 15 n. 5.
In the present appeal, we do not have an adequate basis in either the trial record or appellate filings to address the “open question” of whether, or in what circumstances, UCMJ jurisdiction can be extended over third-country nationals for conduct that is subject to Article III coverage. In that context, it is appropriate to limit our decision to the statutory category now before us — a host-country national whose conduct is excluded from Article III coverage under MEJA.
The present case does not require us to address Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), and its progeny. Eisentrager did not involve conduct subject to trial in an Article III court. In Eisentrager, the Supreme Court emphasized that the case involved the conviction of an enemy alien by an overseas military commission in circumstances where no Article III court was available. See id. at 765, 777-78, 781, 70 S.Ct. 936. Consideration of whether Eisentrager applies to persons subject to Article III coverage under a statute such as MEJA should be reserved for a case in which the affected person has an opportunity to fully litigate that issue at trial and on appeal.

Structural considerations in the context of Article III coverage

The issue of jurisdiction involves a broader set of constitutional values than the personal exercise of Fifth and Sixth Amendment rights. The Supreme Court, in its consideration of UCMJ jurisdiction over civilians, focused significant attention on constitutional structure, including the separation of powers, the role of Article III as the foundation for criminal trials, and the function of trial by jury as a limitation on governmental power. See, e.g., Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 237-38, 246-47, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); Reid v. Covert, 354 U.S. 1, 10, 22, 36, 38-39, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); Toth v. Quarles, 350 U.S. at 17-18, 76 S.Ct. 1; see generally Grisham v. Hagan, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960); McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960).
The Supreme Court, in its comparison of courts-martial to Article III courts, took note of the reforms contained in the Uniform Code of Military Justice, as well as the honor and professionalism of military personnel, but concluded that courts-martial are constitutionally distinct from Article III courts from a separation of powers perspective. See, e.g., Covert, 354 U.S. at 36-38, 77 S.Ct. 1222; Toth, 350 U.S. at 17-18, 76 S.Ct. 1. In its separation of powers analysis, the Court focused on the fact that the critical decisions of guilt and innocence in a court-martial are made by “ad hoc bodies appointed by a military officer from among his subordinates” who “do not and cannot have the independence of jurors drawn from the general public.” Covert, 354 U.S. at 36, 77 S.Ct. 1222. The Court also focused on the absence of judges with the degree of independence provided by the tenure provisions of Article III. See id. at 36-37, 77 S.Ct. 1222; Toth, 350 U.S. at 17-18, 76 S.Ct. 1.
Although the military justice system has continued to evolve since the Supreme Court’s decisions in the Toth-Guagliardo line of eases, the differences between courts-martial and Article III courts remain fundamentally unchanged with respect to the separation of powers. The division of responsibilities for criminal trials in the Article III courts embodies the classic constitutional allocation of powers among legislative, executive, and judicial functions. The organization of courts-martial, by contrast, reflects a long tradition of concentrating power in the Executive Branch. As in the past, today’s military justice system does not permit trial by jury, does not provide constitutional or statutory tenure protections for the judiciary, contains features that combine prosecutorial and judicial functions, and reflects the significant exercise of legislative functions by executive officials. See, e.g., Articles 25, 26, 36, 56, 60, 92, UCMJ, 10 U.S.C. §§ 825, 826, 836, 856, *282 860, 892 (2006). The military justice system exists as an instrument of command, designed to promote the good order and discipline essential to the conduct of military affairs.
The import of the differences between courts-martial and Article III courts primarily concerns constitutional structure, not due process. See Singleton, 361 U.S. at 246, 80 S.Ct. 297. The issue of jurisdiction addresses the preference for trial by jury as a matter of constitutional choice, not fundamental fairness. The military justice system, on a daily basis, demonstrates that a person can receive a hearing and appellate review consistent with fundamental notions of fairness. See Weiss v. United States, 510 U.S. 163, 176-81, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). In a trial by court-martial, the accused enjoys many of the same rights as a defendant in an Article III trial, and in some areas, the accused before a court-martial has greater rights than a defendant in an Article III proceeding. See, e.g., Homer E. Moyer Jr., Procedural Rights of the Military Accused: Advantages Over a Civilian Defendant, 22 Me. L.Rev. 105 (1970).
The constitutionality of a criminal trial, however, involves more than adherence to general notions of fairness. The Constitution, as a source of authority and a limitation on power, mandates the conduct of criminal trials in a particular manner. See Toth, 350 U.S. at 18, 76 S.Ct. 1. Cf. Crawford v. Washington, 541 U.S. 36, 61-63, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
In the military justice system, Congress has established a criminal trial forum that does not comport with the structure mandated by Article III of the Constitution. Judicial review of legislation that subjects civilians to trial by courts-martial requires an assessment of whether the statute at issue, on its face and as applied, fits within the narrow range of constitutional exceptions to the requirements of Article III. See, e.g., Guagliardo, 361 U.S. at 284-86, 80 S.Ct. 305; Covert, 354 U.S. at 30-34, 77 S.Ct. 1222. Such an assessment requires consideration of whether the exercise of jurisdiction under the legislation involves the “least possible power adequate to the end proposed.” Toth, 350 U.S. at 23, 76 S.Ct. 1. See Guagliardo, 361 U.S. at 286, 80 S.Ct. 305. Cf. Solorio v. United States, 483 U.S. 435, 440 n. 3, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987) (noting that the “least possible power” test is confined to the context in which it arose — -a court-martial of a civilian).
The Supreme Court observed in Covert that the exercise of court-martial jurisdiction over civilians raises constitutional issues of the “utmost concern.” 354 U.S. at 3, 77 S.Ct. 1222. The present case does not provide an appropriate vehicle for addressing the full range of those important issues.
Application of the standard developed in the Toth-Guagliardo line of cases calls for a carefully developed trial and appellate record sensitive to the statutory text and operational context of the MEJA-UCMJ relationship in a specific set of factual circumstances. The constitutionality of UCMJ jurisdiction over civilians other than host-country nationals is an open question, and should remain so until properly developed and briefed in a case involving parties having a direct interest in the scope of such a decision.